HALL, Judge.
Plaintiff, Jacob Bangs, brought this suit for damages for personal injuries sustained by his minor son, Jacob Bangs, Jr., and for special damages incurred by him in the treatment of his son. Bangs, Jr., sustained personal injuries on February 2, 1965, while riding as a guest passenger in an automobile belonging to Mrs. Ernest Aiavo-lasiti and driven by Ernest Perry along North Bernadotte Street in the City of New Orleans. The accident occurred when the automobile dropped into the unfilled space between the tracks of a railroad which intersects North Bernadotte Street at right angles. The railroad tracks are laid in the bed of St. Louis Street and are owned and operated by the New Orleans Terminal Company.
Made defendants are:
1) Hanover Insurance Company, the omnibus liability insurer of the driver, Ernest Perry.
2) The New Orleans Terminal Company, owner of the railroad tracks, and
3) The City of New Orleans.
Hanover Insurance Company filed third party pleadings against the City and the Terminal Company demanding the amount of $173.45, plus interest and costs, being the amount it paid under a collision policy for damages done to the automobile driven by Perry. Hanover’s subrogation interest and the amount thereof was stipulated.
Southern Railway Company and Travelers Insurance Company had also been made parties defendant by plaintiff, and Hanover had made Travelers Insurance Company a third party defendant also but both of these companies were dismissed from the litigation by consent of all parties prior to trial on the merits.
*326 Following trial on tire merits judgment was rendered in favor of plaintiff and against the defendants, City of New Orleans and New Orleans Terminal Company in solido for $5,000.00 for the use and benefit of his minor son, Jacob Bangs, Jr., plus $2,209.45 representing plaintiff’s special damages, together with interest and costs. Plaintiff’s suit against Hanover Insurance Company was dismissed at plaintiff’s cost, and Hanover Insurance Company was awarded judgment against The City of New Orleans and New Orleans Terminal Company in solido for $173.45, plus interest and costs, same being the stipulated amount of its subrogated claim.
The City of New Orleans and New Orleans Terminal Company filed separate appeals. No answers to the appeals were filed.
The question presented is whose negligence caused the accident? Was it negligence on the part of the driver, Ernest Perry, Hanover’s insured, or was it negligence on the part of the City or the Terminal Company or both of them which caused it? Although no written reasons were assigned by the Trial Judge it is evident from his judgment that he found no negligence ■on the part of Perry but found that the proximate cause of the accident was the joint and concurrent negligence of the City and the Terminal Company.
In this Court only the City contends that the driver, Ernest Perry, was negligent. Neither the plaintiff nor the railroad have so contended either in their briefs or in argument
The record reveals the following undisputed facts :
The accident occurred shortly after 10 P.M. as Perry (aged 17), driving his grandmother’s car, was taking several of his fellow high-school students home from a basket-ball game. Young Bangs (aged 17) was riding in the front seat next to Perry. Two other students, a boy and his date, were occupying the back seat. The car had been travelling on Toulouse Street in the direction of the lake, and, just prior to the accident, Perry had turned left into North Bernadotte Street heading in an uptown direction with the intention of taking the young girl home.
The railroad tracks where the accident occurred run parallel to, and one block uptown, from Toulouse Street and cross North Bernadotte Street at right angles. There are several tracks, both main line and switch tracks. Although North Bernadotte Street is black topped (but in poor condition) from Toulouse Street to the tracks and continues black topped for many blocks in an uptown direction beyond the tracks, there is no vehicular crossing over the tracks.
The spaces between the rails have never been filled at the point where they cross North Bernadotte Street, although vehicular crossings are maintained at North Anthony Street and at North St. Patrick Street which flank North Bernadotte Street on each side.
The accident occurred when the front wheels of the car driven by Perry ran off the hard surfaced portion of North Berna-dotte Street, crossed over both rails of the first track and became jammed in an unfilled depression where a switch track joins the main line. The jamming of the front wheels brought the car to a sudden stop throwing young Bangs forward with such force that his head went through the windshield.
The testimony shows that Perry was proceeding on North Bernadotte Street at a speed of from 15 to 20 miles an hour. He knew the tracks were ahead because he had in the past crossed the railroad at the North Anthony and North St. Patrick Street crossings. He was completely unaware however that there was no fill between the tracks at North Bernadotte Street and that it was impossible to proceed across. As he approached the tracks he slackened speed by removing his foot from the accelerator and was intent on watching for trains approaching from either his *327 left or his right. This lookout necessarily-continued up until he was right upon the tracks as the buildings on both sides of the street are located no further than IS feet away from the first rail. In order to see in either direction he had to get fairly close to the tracks. When Perry noted the absence of trains and returned his full attention to the road in front of him, he realized for the first time that the crossing was impassable. He applied his brakes but practically at the same time his front wheels rolled over the first rail and down onto the cross-ties between the first and second rail. His front wheels then bounced over the second rail and became wedged between the second rail and the rail of a switch track bringing the car to a sudden stop. When his car came to rest the rear wheels were still on the surfaced portion of North Bernadotte Street.
The City charges that Perry was negligent in not keeping a proper lookout.
The block of North Bernadotte Street between Toulouse Street and the tracks is approximately 250 feet long. The street is black topped up to within 15 feet of the tracks and consists of shells the last 15 feet. There is a slight gradual up-slope to the street from Toulouse Street to the shells and then the street slopes slightly downward to the tracks. The first rail of the tracks is level with the surface of the street. Buildings occupy both sides of the street. There is a street light at the corner of Toulouse and North Bernadotte Streets and another street light approximately 60 feet on the uptown side of the tracks. Telephone poles and wires as well as high power electric lines cross the tracks. The street is open to traffic on both sides of the tracks. The gradual up-slope to the street causes the lights of an automobile to shine slightly upward so that they focus more clearly on the street beyond the tracks. The police officer who investigated the accident, as well as the passengers in the automobile, testified that the scene of the accident was extremely dark. There were no lights in the buildings and the only street lights were the two previously mentioned. The police officer said the area was so dark that it was necessary to use the spot lights on the tow wagon to remove the car from the tracks. The testimony shows that to a motorist travelling at night North Bernadotte Street gives every impression of being a through street.
There were no signs or signals of any kind placed by the City or the railroad warning motorists on North Bernadotte Street that the railroad crossing was impassable.
Although Perry was familiar with the crossings at North Anthony and North St. Patricks Streets neither he nor any of his passengers had ever been on North Berna-dotte Street. There were no warning signs and there was no reason for him to believe that the crossing was impassable. His main attention, as he reached the tracks, was directed to the approach of trains, as it should have been, and the conditions as revealed by the testimony were such that he would not have been able to tell the tracks were impassable until he was immediately upon. them.
We find no manifest error in the Trial Judge’s finding that there was no negligence on Perry’s part and consequently no liability on the part of Hanover Insurance Company, his insurer.
We are of the opinion that the unfilled railroad crossing constituted a virtual trap and that the proximate cause of the accident was the absence of a passable crossing plus the total lack of warning signs.
The railroad tracks, as we have seen, occupy the bed of St. Louis Street. The right to erect and maintain its tracks in this street was granted by the City unto the New Orleans and San Francisco Railroad Company, predecessor in title of the defendant, New Orleans Terminal Company, by Ordinance No. 1615 New Council Series, *328 adopted February 10, 1903. Section 9 of this ordinance provides as follows:
“ * * * That all streets through and across which the tracks of said company are laid shall be kept in good order and condition between the rails and two feet on each side thereof. All pavements taken up in the laying of such tracks shall be relaid at the company’s cost, to the satisfaction of the Engineer and the Commissioner of Public Works, and shall be thereafter maintained between tracks and for two feet on each side thereof. On all streets now not paved, which may hereafter be paved by the City, the said company shall pay the cost of paving between the rails and two feet on each side thereof, and the same rule shall apply to the renewal of pavements on streets not paved.”
' LSA-R.S. 45:323 provides in part as follows:
“All steam railroads * * * whose tracks are laid on or across the public street of any municipality, shall keep in good condition and suitable for vehicular traffic that portion of the street lying between the rails of the tracks of such steam railroad and railways, and for a distance of two feet on the outside of each rail of the tracks used or operated by them, together with the necessary headers * * * ”
The City correctly contends that it is not legally obligated to fill and maintain the Terminal Company’s roadbed, since that obligation rests solely upon the Terminal Company. It also contends that it has no obligation to install railroad crossing signs commonly called “cross bucks”. However the City is obligated to maintain its streets and sidewalks in a safe condition for the travelling public. We have here an unusual and inherently dangerous situation on North Bernadotte Street which amounted to a hidden trap. This condition had existed for many years and the City was well aware of it. Two similar accidents had occurred at this crossing, one on August 27, 1962 and the other on May 26, 1964. In November of 1962 the City had addressed a letter to the Terminal Company calling upon it to provide a roadway across the tracks but this was never done. We are of the opinion that the City was negligent in not placing and maintaining a barricade at the tracks or some sign or signal at the corner of Toulouse and North Bernadotte Streets or somewhere along the block leading up to the tracks warning motorists of the fact that the crossing was not passable. (See generally German v. City of New Orleans, La.App., 3 So.2d 181; Carlisle v. Parish of East Baton Rouge, La.App., 114 So.2d 62; Pierrotti v. Louisiana Department of Highways, La.App., 146 So.2d 455; Nauck v. Cooperative Cab Company, La.App., 185 So.2d 345; Granger v. Travelers Insurance Company, La.App., 167 So.2d 211.)
The Terminal Company was negligent in failing to comply with the duty imposed upon it by LSA-R.S. 45:323 to “keep in good condition and suitable for vehicular traffic that portion of the street lying between the rails of the tracks.” Its negligence was of long standing duration. In fact the tracks have never been filled in. Further the railroad did not fill in the tracks or make the crossing passable even after it received the letter from the City in November 1962 and furthermore did nothing to correct the situation even though it had in the files of its claim department records of the two previous similar accidents.
We are of the opinion that the proximate cause of the accident was the joint and concurrent negligence of the City and the Terminal Company.
The Terminal Company has in effect admitted its liability. It does not complain of the Trial Court’s holding that it was negligent. The only complaint made by it is that the sum of $5,000.00 awarded by the Trial Judge for the pain, suffering, and disfigurement of young Bangs was exces *329 sive, and prayed only that the judgment appealed from he amended by reducing the amount awarded therefor. There is no complaint of the award of $2,209.45 for special damages, which includes estimated future medical expense.
Plaintiff contends in his brief that the $5,000.00 award should be increased to the sum of $8,000.00, citing Landrum v. New Amsterdam Casualty Company, La. App., 149 So.2d 182, but since plaintiff did not answer the appeals the only question before us is whether the award was excessive.
Following the accident young Bangs was taken to the hospital in an ambulance. He was bleeding profusely. He was there examined and his wounds cleaned and sutured by Dr. Louis Krust, a plastic surgeon, under a local anesthetic. He was hospitalized for two days. He was seen thereafter by Dr. Krust on nine different occasions from February 4, 1965 through May 5, 1965. He was again examined by Dr. Krust in May of 1966 just prior to the trial.
Dr. Krust testified that young Bangs had ten distinct lacerations and wounds of the face and forehead, seven of which required suturing. He listed and described the wounds as follows:
“A. I gave each of them a number. Number one, there was an oblique laceration beginning in the right upper eyelid extending medially through the right brow and onto the mid-forehead through the right brow and lid.
No. 2, there was a secondary laceration or wound parallel to the one I just described and approximately half the length of the first wound and joining the first wound over the mid-forehead. This created a “Y” type laceration and created a small gap of forehead skin and underlying muscle which was hanging somewhat free but it was attached.
Scar No. 3 was a three inch oblique laceration of the left mid-forehead extending upward toward the hair line, upward in this fashion (indicating).
Scars No. 4 and 5 were two small transverse lacerations above the' right lateral eyebrow up in this area (indicating).
Scars 6 and 7 were two small vertical lacerations over the mid-forehead close to the hair line, two small lacerations up in this area (indicating).
Scar No. 8 was a half inch area of multiple scuffs and abrasions with partial loss of the superficial skin of the mid-forehead.
Scars No. 9 and 10, I should say, wounds No. 9 and 10, there were one or two smaller puncture wounds and lacerations over the forehead skin. Om testing the forehead with a needle I found that there was loss of sensation in one area because one of the nerves coming up above the brow had been either totally or partially sectioned and produced an area of numbness, in my notes, over the right side of the forehead close to the midline.”
On his last examination in May 1966, Dr. Krust found that all of the scars had healed and softened, but left some residual cosmetic defects which he described. He made no further note of the numbness in the forehead, although young Bangs testified that he still suffers from lack of sensation in his right forehead, and from occasional headaches. The doctor recommended that the cosmetic defects be improved and corrected by sanding them to blend them in with the surrounding skin. He also recommended that scar No. 9 be excised and revised, and estimated that the *330 surgery would require two or four distinct surgical procedures and would necessitate hospitalization for one or two days.
We do not find that the Trial Court’s assessment of damages' in this case was an abuse of the “much discretion” vested in him. (See our decision in McKay v. United Fire & Casualty Company, La.App., 192 So.2d 876, December 5, 1966).
For the foregoing reasons the judgment appealed from is affirmed;' costs of this appeal to be borne by appellants.
Affirmed.