375 So.2d 169 (1979)
Gloria Y. HARRISON, Plaintiff-Appellant,
v.
STATE of Louisiana, DEPARTMENT OF HIGHWAYS, et al., Defendants-Appellants.
No. 13895.
Court of Appeal of Louisiana, Second Circuit.
August 27, 1979.
*171 Booth, Lockard, Jack, Pleasant & LeSage by Henry A. Politz and Fred H. Sutherland, Shreveport, for plaintiff-appellant.
Nelson & Achee by Roland J. Achee, Shreveport, for City of Shreveport.
David K. Balfour, Baton Rouge, for State of Louisiana Dept. of Highways.
Before PRICE, HALL and JONES, JJ.
JONES, Judge.
The defendants, State of Louisiana, through the Department of Highways (now the Department of Transportation and Development) and the City of Shreveport appeal a judgment rendered against them in solido in favor of plaintiff for damages sustained by her in an automobile accident which occurred August 16, 1971 on Market Street (La. Highway 1) at the intersection of Creswell Street in the City of Shreveport.
Plaintiff appeals seeking an increase in her general damage award.
The judgment was based upon a finding that among the causes of the accident was a failure of defendants to correct a sight obstruction caused by a concrete bridge rail along the west side of Market Street in the proximity of the Creswell-Market intersection, and upon a finding that plaintiff was guilty of no negligence which contributed to the accident.
We increase the plaintiff's general damage award from $75,000 to $125,000 and as amended affirm the judgment.
Market Street, at the site of the accident, is a three-lane, one-way, southerly, major traffic thoroughfare in the City of Shreveport and is part of the Louisiana State Highway System. It is a viaduct of bridge-type construction, elevated over railroad tracks, and was initially constructed in 1928. Creswell is located near the south end of the viaduct and intersects Market Street viaduct from the west and forms a "T" intersection. Creswell is a hard surface city street containing two lanes, one provided for eastbound and one provided for westbound traffic. There is no traffic light controlling the Creswell-Market intersection, but traffic proceeding east on Creswell is controlled by a stop sign on Creswell requiring traffic eastbound on Creswell to stop and yield the right of way to southbound traffic on Market. Because Market is a part of the State Highway System, it is controlled by the State. However, the general maintenance of Market had been assumed by the City of Shreveport by contract with the State many years prior to the occurrence of the accident here sued upon. This maintenance contract would not require the city to make structural alteration upon the highway or paint traffic lane stripes. Both of these functions were performed by the state who also inspected the highway to assure the city properly performed the maintenance contract.
In 1965 the city determined the concrete bridge railing along the west side of Market, which appears from pictures in the record to be approximately five feet high, in the proximity of Creswell intersection created a sight obstruction which made the intersection hazardous to eastbound traffic on Creswell attempting to enter Market. In order to eliminate the hazardous situation existing at the intersection, the city by *172 ordinance designated Creswell as a one-way street available to westbound traffic only. In 1966, without any effort to remove the sight obstruction existing on Market Street, and contrary to the advice of its traffic engineering department, the city removed the one-way restriction on Creswell and again made this street available for eastbound traffic.
At 4:30 p. m. on August 16, 1971, at a time when traffic was extremely heavy on Market, plaintiff was driving south in the outside, westernmost lane of Market at a speed of about 40-45 miles per hour, within the speed limit of 45 miles per hour. As she reached a point a very short distance north of the Creswell intersection, a white Falcon stationwagon suddenly exited Creswell turning right onto Market immediately into the path of plaintiff. She, in order to avoid an imminent collision with the Falcon, moved from the outside (west) lane of Market to the center lane. Instantly, upon making this maneuver, she observed another southbound vehicle in her path of travel in the center lane very close, and in order to avoid a collision with this vehicle she applied her brakes hard and lost control of her car. The car skidded easterly across the two easternmost lanes of Market, a sidewalk located along the east side of Market, and through a pedestrian-type pipe guard rail located along the east side of Market and down a distance of some 35 to 40-feet onto the ground located below the viaduct. Plaintiff sustained serious, painful personal injuries requiring extensive and lengthy treatment and endures permanent effects from these injuries.
The trial judge found the blind intersection was a significant contributing cause of the accident which was precipitated by the Falcon's entry into the dangerous intersection and found plaintiff was guilty of no contributory negligence. He found the State had constructive notice of the hazard and was negligent in its failure to discover and correct the sight obstruction during the long period of time that had elapsed since its assumption of control over Market Street. He found the city had actual notice of the sight obstruction and the dangerous condition that existed at the intersection and was negligent in removing the one-way restriction on Creswell and permitting its use by eastbound traffic without being certain the state would correct the sight obstruction created by the Market Street bridge railing. On these findings the trial court concluded the defendants were solidarily liable for plaintiff's damages and awarded her a judgment for all special damages established during trial, though they exceeded the amount sued for,[1] but he restricted the award for her general damages to the amount of $75,000 for the reason this was the amount prayed for.
The state assigns as error the trial court's finding of constructive notice, contending the sight obstruction was not such a hazardous condition that the state could be construed to have constructive notice of its existence and further complains of the failure of the trial court to find plaintiff guilty of contributory negligence. The city also contends plaintiff was guilty of contributory negligence and further assigns as error: (1) the finding that the sight obstruction and the sudden entry into Market by the Falcon contributed to the accident; (2) the trial court's failure to find the vehicle which obstructed plaintiff's path after she entered the center lane was a Buick automobile which had entered Market from a parked position in front of a furniture store and the trial court's failure to find that the entry of this vehicle into Market caused the accident; (3) the trial court's failure to find the city had given actual notice to the state of the sight obstruction prior to the accident; (4) the finding that the city was negligent in eliminating Creswell as a one-way street and permitting Creswell eastbound traffic to exit onto Market without making certain the state was aware of and removed the sight obstruction existing on *173 Market; and (5) several evidentiary rulings of the trial judge, the principal one being the refusal of the trial judge to permit the city to introduce into evidence the plaintiff's discovery deposition.
Plaintiff assigns as error the ruling of the trial court that it could not award her a judgment for general damages in excess of the $75,000 prayed for, even though the trial judge, in his reasons, acknowledged that plaintiff had established general damages approaching $125,000.
The assignments of errors asserted by the parties establish the issues on this appeal.

CONTRIBUTORY NEGLIGENCE
Plaintiff testified the white Falcon entered her outside lane on Market at a time when she was so close to the Creswell intersection that had she not changed lanes a collision would have been unavoidable. Her testimony was corroborated by three other eye witnesses to the accident; a Mr. Free, who was sitting in his truck parked on the east side of Market south of the Creswell intersection; a Mrs. Captain, who had just gotten out of her car which was parked south of the Free truck; and a Mr. Wesley who was standing on Creswell some distance west of its intersection with Market.
Plaintiff testified as she changed to the center lane, her path of travel was obstructed by another southbound vehicle in the middle lane, and in order to avoid colliding with it, she applied her brakes and lost control of her vehicle. The emergency which required her to suddenly change lanes was created by the operator of the Falcon who obstructed plaintiff's right of way by entering Market. Because of the occurrence of this emergency situation which required the sudden lane change, plaintiff had no opportunity to ascertain that the middle lane of Market was free of traffic to the extent she could safely enter same, which explains why she found herself confronted by a southbound vehicle whose presence she was unaware of when she entered the middle lane. Plaintiff testified she did not know where the vehicle came from. The almost simultaneous occurrence of these two sudden emergencies created the situation which required plaintiff to apply her brakes hard and resulted in her loss of control of her vehicle. There was no negligence in plaintiff's operation of her vehicle prior to the occurrence of the situations described and the error of judgment, if any, she made in the manner that she applied her brakes which caused her to lose control of her vehicle is excused under the law. The rule is well established in the jurisprudence that a driver in an emergency situation which he had no part in creating is not held to the exercise of the same standard of care and good judgment that the law normally requires. We find the evidence abundantly supports the trial judge's finding that plaintiff was guilty of no negligence which contributed to the accident.

WAS THE ACCIDENT CAUSED BY A CAR ENTERING PLAINTIFF'S MIDDLE LANE OF TRAVEL FROM A PARKED POSITION ON THE EAST SIDE OF MARKET?
The city strenuously contends plaintiff's accident was not caused by an emergency created by the entry of the Falcon automobile into her lane of travel on Market. The city contends plaintiff, upon observing the Falcon, had safely entered the middle lane of Market and her path of travel was then unobstructed. The city then argues a Buick automobile parked in front of a furniture store located on the east side of Market south of its intersection with Creswell suddenly entered plaintiff's path of travel in the middle lane of Market, thereby creating the situation which required plaintiff's sudden application of her brakes.
The trial judge found the vehicle which left the parking place in front of the furniture store was not the one which confronted plaintiff upon her entry into the middle lane for the reason that the aerial photos in the record indicated it would not have been possible for a car entering Market from the front of the furniture store to have created the emergency situation that caused plaintiff to lose control and crash through the guard rail which was located north of the *174 furniture store. The record does not clearly reflect the distance north of the furniture store to the point where plaintiff crashed through the guard rail and does not reflect the distance from the crash site to the location of the parked car in front of the furniture store to which the city refers. However, we find the evidence fully supports the trial judge's conclusion. The record does establish that there is a distance of 150 feet between the point where the concrete guard rail on the east side of Market terminates and the pipe hand rail commences to the north wall of the furniture store. The record does not reflect the width of the furniture store nor the relative position of the parked Buick in front of it. There are pictures in the record showing the hand rail which establish plaintiff crashed through it very near the north end of it at a point where it joined the concrete guard rail. This establishes plaintiff no doubt applied her brakes at a point even further to the north. Under these circumstances, the vehicle in the center lane which brought about the sudden application of plaintiff's brakes could not have been one which exited from a parked position in front of the furniture store, which necessarily had to be approximately 150 feet from the section of guard rail which plaintiff knocked down when she collided with it. This physical evidence is corroborated by the testimony of Mr. Free and Mrs. Captain, both of whom testified the Buick had departed from its parking place at the furniture store at the time the Falcon entered Market Street.
The sole basis for the city's contention is contained in the discovery deposition of plaintiff and in earlier statements taken from Mrs. Captain and Mr. Free. The references made by these witnesses in earlier statements as to the parked Buick's entry into Market from the front of the furniture store, and the possibility of its having contributed to plaintiff's accident, were rejected by them at trial and explained to the satisfaction of the trial judge, who had the opportunity to see and hear them testify and to evaluate their credibility.
Plaintiff stated she knew not from whence the vehicle came that appeared in front of her in the middle lane and witnesses Free and Captain testified the Buick had left its parked position before the Falcon ever caused plaintiff to change lanes. There were no witnesses who testified at trial in support of the city's position that the accident was caused by the entry of a vehicle parked on the east side of Market into plaintiff's path of travel. The evidence fully supports the trial judge's finding that the Buick which left its parked position in front of the furniture store contributed in no way to the accident.

DUTY OF THE STATE AND CITY
The state and the city have a duty to construct and maintain highways and streets in a condition reasonably safe for motorists exercising ordinary care and reasonable prudence. In the performance of this duty, the character of the road and the probable traffic must be kept in view in meeting the requirement of reasonable safety. In order for them to be liable for accidents caused by unsafe conditions, it must be shown they either had actual or constructive knowledge of the dangerous condition and an opportunity to either remedy the condition or at least to alert and warn motorists of its presence and they failed to do either. U. S. F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976); Barr v. State, Through La. Dept. of Highways, 355 So.2d 52 (La.App. 2d Cir. 1978); Hodges v. State, Through Dept. of Highways, 370 So.2d 1274 (La.App. 3d Cir. 1979); Robertson v. Handy, 354 So.2d 626 (La.App. 1st Cir. 1977); Simmons v. Hernandez, 287 So.2d 637 (La.App. 3d Cir. 1973); Bangs v. City of New Orleans, Dept. of Streets, 196 So.2d 324 (La.App. 4th Cir. 1967).

CITY'S LIABILITY
The supreme court decisions of Hamilton v. City of Shreveport, 247 La. 784, 174 So.2d 529 (1965) and Board of C. of P. of New Orleans v. Splendour S. & E. Co., 273 So.2d 19 (La.1973) conclusively established the liability of the City of Shreveport for its torts, *175 and the above cited jurisprudence recognizes the duty of the city to maintain its streets free of hazards to motorists exercising ordinary care. The decisions cited by the city to support its contention that it is not liable for the hazardous condition created by the conditions at the Market-Creswell intersection are all factually dissimilar to the situation here presented and the analogous situations contained in the cited jurisprudence that establishes the city's duty to maintain its streets free of hazard. For these reasons the cases cited by the city are not contra to the above cited jurisprudence and no useful purpose would be served by a detailed discussion of them.
The city's 1965 sight survey of the intersection and its action of prohibiting the use by eastbound traffic on Creswell established its knowledge and recognition of the hazardous sight obstruction created by the concrete railing along the west side of Market. The city's action in 1966 of again permitting the use by eastbound traffic of Creswell, while the sight obstruction remained, is negligence.
The city contends because plaintiff was unable to identify and produce the driver of the Falcon, she did not establish a causal connection between the sight obstruction and the entry into Market by the Falcon. The city's position is that she did not establish the driver of the Falcon attempted to look northerly on Market to determine that it was safe to enter Market and that his observation was obstructed by the bridge railing. We believe a reasonable inference from the fact that the Falcon entered Market immediately into the path of plaintiff's vehicle is that the driver of the Falcon made an attempted observation north on Market and failed to see plaintiff because of the existence of the sight obstruction. This inference is corroborated by the testimony of Mr. Wesley, who from a position on Creswell west of its Market Street intersection, observed the Falcon and a vehicle immediately in front of it pull up to and back away from the Market intersection two or three times. This testimony establishes the Falcon driver was attempting to see north on Market, but was having difficulty in making a successful observation of the southbound traffic on Market for the purpose of determining when it was safe to enter Market. This witness testified that after the first of the two vehicles entered Market, the Falcon pulled up to the intersection and stopped for a very short time before proceeding into the intersection. The only reason for this stop by the driver of the Falcon would have been for the purpose of again attempting to make an observation of approaching southbound Market traffic before entering the intersection. There is adequate evidence in the record to support the trial judge's finding that the sight obstruction was a contributing cause of the accident.

STATE'S LIABILITY
The state contends it had neither actual nor constructive knowledge of the hazard. While there is no positive evidence in the form of testimony of any witness that a representative of the highway department was contacted and advised of the existence of the hazard, there is evidence from which a conclusion could be reached that representatives of the highway department did in fact have actual knowledge of the hazard. The Traffic Engineer of the City of Shreveport testified that at the time Creswell was made one-way in 1965, he removed the stop sign located at the intersection which had been placed there to control eastbound traffic and stated he would not have removed this sign without advising the state he was doing so, and the reason for its removal. At the time the city made Creswell available to eastbound traffic in 1966, the state striped a Market Street exit lane for traffic leaving Creswell. State employees performing this function would necessarily have been in the immediate proximity of the sight obstruction and could hardly be said to have been unaware of the sight obstruction which is so obvious that neither the state nor the city contends it doesn't exist.
The state performed semi-annual inspections of Market Street and the Market *176 Street viaduct. There are in the record reports of inspections rendered by state employees before the accident. There are five reports of state street inspections of La. Highway 1, Market Street, from Texas Street south to Youree Drive contained in the record. The area of Market Street covered by these street inspections includes the Market-Creswell intersection. The first of these reports is dated May, 1969 and they follow at six-month intervals with the last report dated April, 1971. There is a report of a Market Street viaduct inspection conducted in April, 1971, only four months before the accident.
The argument of the state contained in brief that their semi-annual viaduct inspections did not include the area at the Creswell-Market intersection because the viaduct at this point was on the ground and not an elevated bridge structure is not supported by the evidence which establishes that plaintiff's vehicle traveled downward a distance of 35-40 feet from the viaduct to the ground.
These inspections of La. Highway 1 and the Market Street viaduct by state employees placed them in the immediate proximity of the sight obstruction at the Creswell-Market Street intersection, and a reasonable inference from these circumstances is that they became aware of the existence of the sight obstruction existing at the intersection. The approximately five-foot high concrete railing, though not made of solid concrete, contained only small open spaces in the concrete and a very casual observation of the railing would impress the observer with the fact that a vehicle driver on Creswell at its intersection with Market would have difficulty seeing approaching southbound Market Street traffic.
We believe that the circumstances hereinabove set forth could have formed an evidentiary basis for the trial court to have made a finding that the highway department had actual knowledge of the existing hazard, but at the very least, these circumstances abundantly support the trial judge's conclusion the state had constructive knowledge of the hazard.
In the decision of Mauthe v. Gibson, et al., 367 So.2d 1280 (La.App. 3rd Cir. 1979) the court stated:
"The State's obligation to the public to care for its highways includes the duty `to provide and enforce an efficient and continuous system of inspection of all state highways . . .' Jones v. Louisiana Dept. of Highways, 338 So.2d 338 (La. App. 3rd Cir. 1976). The Department of Highways also has the duty to discover and correct visual obstructions at intersections. Stewart v. Lewis, 292 So.2d 303 (La.App. 1st Cir. 1974) . . ." (Emphasis supplied) Id. at 1284.
The state had control of Market Street in 1966 when the hazard created by the bridge railing that had been earlier eliminated by one-waying Creswell to eastbound traffic again came into existence when Creswell was made available to eastbound traffic. Five years then elapsed without the state discovering and taking any action to eliminate the sight obstruction which brought about the accident on August 16, 1971.
Following the accident the highway department received written and verbal requests from private citizens in the City of Shreveport, the City's Traffic Engineering Department, and its Commissioner of Public Works to alter the bridge railing to remove the sight obstruction. On April 6, 1972, the highway department denied these requests and suggested Creswell again be made one-way for westbound traffic. However, on July 21, 1972, following additional requests from people concerned about the safety of the traveling public on Market and Creswell, the state commenced work reducing the height of the guard rail to twenty-inches for a distance of 158-feet on Market north of its intersection with Creswell. This alteration work not only included a reduction of the height, but an alteration of the form of the structure to provide open space between the component parts of the guard rail through which a driver on Creswell could view Market Street traffic. These changes eliminated the hazardous sight obstruction at the intersection. The work was completed on August 1, 1972, *177 which indicates it required probably less than seven work days and was a relatively inexpensive project for the department.
The department was negligent in failing to do these alterations and remove the hazard long before the date of plaintiff's accident, and it is liable in solido with the City of Shreveport for damages caused to plaintiff as result of its negligent failure to remove the hazard.

RULING OF THE TRIAL JUDGE ON THE ADMISSIBILITY OF PLAINTIFF'S DISCOVERY DEPOSITION
The city contends the trial court erred in refusing to permit it to introduce plaintiff's discovery deposition into evidence. The purpose of the city desiring the discovery deposition placed into evidence was to establish statements made in it by plaintiff which tended to prove her emergency brake application may have been required by a car that entered her middle lane of travel from a parked position on the east side of Market. Prior to the city's attempt to introduce the discovery deposition, plaintiff's statements were all read verbatim into the record by the city's attorney while he was cross-examining plaintiff and she admitted making the statements read from the deposition. To again place this testimony of plaintiff from the discovery deposition into the record would be repetitious, for which there was no justification. While the city was entitled under the provisions of LSA-C.C.P. art. 1450 to offer plaintiff's deposition into evidence for any purpose, this right was subject to the trial judge's discretion to refuse introduction of the deposition when it would serve no purpose and would only clutter the record with a repetition of plaintiff's statements already read into the record and which she admitted under cross-examination of having made in her deposition.
In the federal decision of Fey v. Walston & Co., Inc., 493 F.2d 1036 (7th Cir. 1974) wherein the court was discussing the federal rule which permits the introduction of adverse parties' deposition for any purpose, the court stated:
"Yet there are limitations which afford a trial court reasonable latitude for expedition of the trial. Useless encumbrance of the record cannot be insisted upon in any case. (Citations omitted) . . . Repetitious or immaterial matter may be excluded. . ." Id. at p. 1046.
See also Coughlin v. Capitol Cement Co., 571 F.2d 290 (5th Cir. 1978).
In the decision of Broussard v. State Farm Mutual Automobile Ins. Co., 188 So.2d 111 (La.App. 3d Cir. 1966) the court, while discussing the right to introduce the discovery deposition of an adverse party for any purpose, recognized the rule had been construed by the federal jurisprudence to be subject to some limitations:
". . . although there are expressions that the court has discretion to require counsel to specify the portions deemed relevant and to limit the offer accordingly,. . . (citations omitted) . . . or to exclude those portions unnecessarily repetitious in relation to the witness's testimony on the stand . . ." Id. at p. 119.
There is no statement in the Broussard opinion rejecting the limitation to the rule expressed in the federal cases.
LSA-C.C.P. art. 1450 provides as follows:
"At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
. . . . . .
(2) The deposition of a party . . . may be used by an adverse party for any purpose."
(Emphasis supplied)
We construe the language so far as admissible under the rules of evidence applied as though the witnesses were then *178 present and testifying contained in this article to create discretion in the trial judge to refuse to admit into evidence the discovery deposition of an adverse party when it is repetitious of matters contained in the record and serves no other purpose. We find the trial judge did not abuse this discretion in refusing to permit the city to introduce into evidence the plaintiff's discovery deposition.

INCREASE OF GENERAL DAMAGE AWARD
Plaintiff seeks an increase in the award for general damages from the amount of $75,000 to $125,000. The trial judge in his reasons for judgment made the following statement:
"We cannot exceed the amount pled and prayed for in an award of general damages. Watson v. Morrison, 340 So.2d 588 (La.App. 1st Cir. 1976). Writs den. 342 So.2d 218."
Subsequent to the trial court's decision of November 1978, the Fourth Circuit decided the case of Wexler v. Martin, 367 So.2d 111 (La.App. 4th Cir. 1979) wherein it approved a general damage award of $40,000 when plaintiff in her original petition only demanded $20,000. In this opinion the court gave the following reasons for approving the general damage award in excess of that demanded by plaintiff in her petition:
"In their petition plaintiffs alleged items of general damages, estimating the amount thereof, and at trial they presented evidence to support the demand for relief. The judgment granted the relief in an amount greater than the estimated amount listed in the original petition.
Pertinent to the decision of this issue is C.C.P. art. 862, which provides:
`Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief.'
At the threshold we observe that there is no requirement in the Code for specific allegations of items of general damage. Logically, if there is no need to itemize or estimate general damages, there should be no penalty or limitation on a party who does so.
The exception in the introductory clause of C.C.P. art. 862 is also significant. Inasmuch as the excepted article (C.C.P. art. 1703) expressly provides that a judgment by default cannot exceed in amount that demanded in the petition, the general article (C.C.P. art. 862) should logically be interpreted to mean that other types of final judgments can exceed in amount that demanded in the petition. Of course, this is particularly persuasive since, as noted above, there is no requirement for itemization or estimation of general damages in the first place.
Furthermore, the source of C.C.P. art. 862 is Federal Rule 54(c), and the federal cases interpreting that rule consistently allow judgments to exceed the amount of the demand. 10 Wright & Miller, Federal Practice and Procedure § 2664 (1973); 3 Barron & Holtzoff, Federal Practice and Procedure § 1194 (1958); 16 A.L.R.Fed. 748, § 26 (1973).
We are aware of, but disagree with, the case of Watson v. Morrison, 340 So.2d 588 (La.App. 1st Cir. 1976), in which the First Circuit held, in a divided decision, that C.C.P. art. 862 and 1841 were not intended to allow a trial court to award general damages in excess of the demand. However, another panel of that circuit in Cohrs v. Meadows, 342 So.2d 1172 (La. App. 1st Cir. 1977), applied C.C.P. art. 862 to award 500 weeks of workmen's compensation benefits, although the claimant had only demanded 400 weeks in the prayer of her petition. Moreover, in Cambrice v. Fern Supply Co., 285 So.2d 863 (La.App. 4th Cir. 1973), this court refused to limit the award for future medical expenses to the amount demanded in the petition.
. . . . .

*179 We accordingly reject defendants' argument that the judgment should be reduced for the reason that the amount of damages for pain and suffering exceeds the amount demanded in the petition." Id. at 113-114.
We note that C.C.P. art. 861 which immediately precedes article 862 requires a plaintiff to specifically allege his special damages, but makes no such requirement with regard to general damages. We believe this to be an additional indication that article 862 permits an award of general damages in excess of the estimated value of these damages contained in plaintiff's petition.
We agree with the quoted rationale from Wexler v. Martin, supra, and find the result therein reached is correct. We cite the following three federal cases where Federal Rule 54(c) was applied to award plaintiff's general damages in excess of those demanded in their complaints: Troutman v. Modlin, 353 F.2d 382 (8th Cir. 1965); Caperci v. Huntoon, 397 F.2d 799 (1st Cir. 1968); Bail v. Cunningham Brothers, Inc., 452 F.2d 182 (7th Cir. 1971).
The supreme court denied writs in Wexler v. Martin, supra, 369 So.2d 1352 with four justices subscribing to the denial without comment. The following comments were made by three justices of that court:
"MARCUS, J., would grant the writ, believing the Court of Appeal opinion is incorrect and agreeing with dissent.
CALOGERO and BLANCHE, JJ., concur in writ denial. Result here is probably correct. But since writ was denied in Watson v. Morrison, 340 So.2d 588 (La. App. 1st Cir. 1976), where there was a contrary result writ should be granted and issue clearly decided by that court."
Ordinarily writ denials by the supreme court may not necessarily indicate supreme court approval of the court of appeal's opinion. Because in this case the principal issue involved was whether or not an award of general damage could be made in excess of the amount prayed for and in light of the supreme court's earlier denial of writs in Watson v. Morrison, supra, wherein plaintiff's general damages were limited to the amount prayed for, the writ denial may have substantial significance. It is an indication that the supreme court will eventually render a decision that a plaintiff is not limited to the amount of general damages demanded in the petition.
The city strenuously argues the statement of the court in Wexler, supra, that there is no requirement in the Code of Civil Procedure that general damages be specifically alleged is incorrect. The city contends C.C.P. art. 425 makes this requirement.
C.C.P. art. 425  "An obligee cannot divide an obligation due him for the purpose of bringing separate actions on different portions thereof. If he brings an action to enforce only a portion of the obligation, and does not amend his pleading to demand the enforcement of the full obligation, he shall lose his right to enforce the remaining portion."
The purpose of this article is to prevent a plaintiff from dividing his obligation into separate parts and filing a separate suit upon each of them, thereby creating a multiplicity of litigation. See the decisions of State ex rel. Dobson v. Newman, 49 La. Ann. 52, 21 So. 189 (1897); Kearney v. Fenerty, 185 La. 862, 171 So. 57 (1936); Reynolds & Henry Const. Co. v. Mayor of Monroe, 47 La.Ann. 1289, 17 So. 802 (1895), all cited in the comments under C.C.P. art. 425.
The city argues that the supreme court decision of Sylvester v. Sylvester, 243 La. 663, 146 So.2d 154 (1962) is authority for interpreting C.C.P. art. 425 to preclude plaintiff from being awarded a judgment for general damages in excess of those demanded in the petition. In this case a wife sued her former husband for the offspring of 40 cows which she received in a community property settlement. The Court of Appeal awarded her one-half of the offspring from the entire herd of 200 cows. The Supreme Court reversed the Court of Appeal's decision and gave her one-fifth of the offspring of the 200 head which was the amount of her demand and stated:

*180 "Moreover, even were it otherwise, the judgment of the Court of Appeal could not stand as its decree in favor of Mrs. Sylvester of a one-half interest in the offspring of all the cows is ultra petitionem, or for a greater proportion of offspring than she demanded. See Article 425 of the Code of Civil Procedure, which reenacted in essence Article 156 of the Code of Practice of 1870." Id. at 157.
The case is distinguishable from a situation wherein plaintiff is asserting a claim for general damages. It would be more analogous to a claim asserted by a plaintiff for special damages which C.C.P. art. 861 requires to be specifically alleged:
"Art. 861"When items of special damage are claimed, they shall be specifically alleged."
The plaintiff in Sylvester, supra, alleged a demand for calves from forty cows and could not be awarded one-half the calves from two hundred cows.
Our view of the meaning of Article 425 is that when a demand is made for only part of an obligation the right to later demand the rest of it is lost. The article has no application to a suit on a tort obligation wherein the plaintiff underestimates the value of the damages sustained. The article's application to the tort obligation would be to prevent a suit for damages sustained from the laceration and scarring of the face and a later suit for a broken leg, when both injuries came out of the same accident.
We conclude that Watson v. Morrison, supra, relied upon by the trial judge in limiting the plaintiff's claim to $75,000 is not the law and that under the provisions of C.C.P. art. 862 plaintiff is entitled to the general damages proven by her, even though her conclusionary allegations estimating the value of the damages contained in the petition were inaccurate. We note that in this case there is no showing or indication that defendants were in any way prejudiced in their trial or conduct of the proceedings by the failure of plaintiff to estimate her general damages to their full extent.
Plaintiff was carried from the scene of the accident to the hospital by ambulance. She was found to have sustained deep and multiple lacerations to her forehead, eyebrow, left and right cheeks, upper and lower lips, chin and nose. She had an injury to the left facial nerve and to the left parotid duct and a fracture of the left cheek bone. Plaintiff's left humerus, the long bone of the upper arm, was fractured, the head of the humerus being crushed to one-third of its normal size. She suffered a fracture of the neck of the right femur, the thigh bone. There were deep lacerations of the right wrist, left hand and left leg. There were contusions of the left lower chest and rib cage and a puncture wound to the left tibial, or shinbone, area.
Plaintiff's medical treatment began with more than 300 sutures sewn principally in the facial region, a three and one-half inch Smith Peterson nail, and a three and three-fourths inch Knowles pin drilled into the right femoral neck, and the left shoulder and arm immobilized by a cast. The various surgical procedures required an operation time of four hours.
Plaintiff was released from the hospital more than two months after the accident. Over a three month period, plaintiff improved from a non-ambulatory state to using a walker, then to using a cane, and finally to walking without mechanical assistance. For six months following the accident she had little use of her left shoulder and only limited use for a full year thereafter. Within six and one-half years of the accident, plaintiff has been hospitalized nine times and has received eleven surgical operations, four under general anesthesia.
Plaintiff's residual facial injuries after extensive plastic surgery include permanent scars on the left side of her face, above and below the left lip, on the chin, forehead, right eyebrow, and right cheekbone. These scars are visible at conversational distances and cause plaintiff acute embarrassment. There is a tic on the left side of her face which causes constant twitching of the facial muscles in the left cheek and eye area. Her upper lip is numb and often hard to raise when she desires to talk. The area *181 around her nose and left cheek is hypersensitive. Her chin is numb.
Ms. Harrison now experiences pain in her right hip and will have this pain in the future. The metal nail and pin are still within her hip and are covered by ossified bone. She suffers a permanent limp. There is also pain in her left shoulder which will increase with time. The shoulder has atrophied and has developed post-traumatic arthritis.
The personal injuries sustained by plaintiff were extensive and painful and required extended treatment. She has sustained substantial permanent residual effect from these injuries.
In his reasons for judgment, the trial judge made the following statement:
"Plaintiff in brief suggests that $125,000.00 is appropriate for her general damages. While we might agree that damages for her injuries could approach this sum, the prayer and pleading of her petition only seek such damages in the amount of $75,000.00. We cannot exceed the amount pled and prayed for in an award of general damages. Watson v. Morrison, 340 So.2d 588 (La.App. 1st Cir. 1976). Writs den. 342 So.2d 218.
As we believe her facial injuries alone approach the amount prayed for, we think it unnecessary to further detail the extent of her injuries or to assign a specific award for each specific injury. We believe that it is quite apparent, as well as conceded, that the plaintiff is entitled to at least the amount prayed for."
We construe these statements to be a strong indication that had the trial judge not considered himself limited by plaintiff's petition, he would have awarded her $125,000. An award of this amount would not have been an abuse of discretion and would have been approved by this court under the guidelines of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) and Reck v. Stevens, 373 So.2d 498 (La.1979).
Since in the posture of this case it is our function to determine the amount of damages, we conclude that plaintiff is entitled to an award of $125,000 for her general damages.
We recast the second paragraph of the trial court's judgment to read:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, GLORIA YVONNE HARRISON, and against defendants, the STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF HIGHWAYS, and the CITY OF SHREVEPORT, in solido, in the amount of One Hundred Twenty-five Thousand and No/100 ($125,000.00) Dollars for general damages, and Fifteen Thousand Nine Hundred Ninety-six and 80/100 ($15,996.80) Dollars for special damages, for a total of One Hundred Forty Thousand Nine Hundred Ninety-six and 80/100 ($140,996.80) Dollars, together with legal interest thereon at the rate of seven percent (7%) per annum from the date of judicial demand, August 15, 1972, until paid, and for all costs of these proceedings, including expert witness fees in the amount of Three Hundred Seventy-five ($375.00) Dollars, representing One Hundred Fifty ($150.00) Dollars each for the services of Drs. Simeon Wall and W. W. Fox, and Seventy-five ($75.00) Dollars for the services of Mr. Leland Carter.
As amended, judgment is affirmed at appellants' cost.
NOTES
[1] Special damages must be specifically pleaded, C.C.P. art. 861, but when those not pleaded are proved without objection the well-settled jurisprudence construes the pleadings as expanded to include those not pleaded.