533 So.2d 54 (1988)
Tommy L. STREETER and Patricia T. Streeter, Plaintiffs-Appellees,
v.
SEARS, ROEBUCK AND COMPANY, INC., Allstate Insurance Company, Gordon D. Simmons and State Farm Mutual Automobile Insurance Company, Defendants-Appellants.
No. 87-675.
Court of Appeal of Louisiana, Third Circuit.
October 5, 1988.
Rehearing Denied November 21, 1988.
Writ Denied January 27, 1989.
*56 Henry E. Yoes, III (Appellate Atty.), Barnett, Pitre, Davis & Yoes, Lake Charles, for Sears, Roebuck & Co., Inc. and Allstate Ins. Co., defendants-appellants.
Steven Broussard, Lake Charles, for plaintiffs-appellees.
Stockwell, Sievert, Viccellio, Clements & Shaddock, Bernard H. McLaughlin, Jr., Lake Charles, for defendant-appellee.
Before DOMENGEAUX, KNOLL and KING, JJ.
KING, Judge.
This appeal presents numerous procedural issues which must be examined to determine whether the trial court committed reversible error and the substantive issues of whether the jury erred in its percentage allocation of fault between defendants and whether plaintiff proved by a preponderance of the evidence that her ulnar nerve injury was causally related to the accident.
This is a tort action instituted by Patricia T. Streeter (hereinafter plaintiff) seeking damages for personal injuries allegedly received in an automobile accident which occurred on December 5, 1984, in Lake Charles, Louisiana. Her husband, Tommy L. Streeter, was not involved in the accident, but joined in the suit claiming damages for loss of consortium and medical expenses. Plaintiff named as defendants: Gordon D. Simmons (hereinafter Simmons), the driver of the truck which collided into the rear end of the plaintiff's vehicle; his insurer, State Farm Mutual Automobile Insurance Company (hereinafter State Farm); and Sears, Roebuck and Company, Inc. (hereinafter Sears), which had performed a brake job on Simmons' truck. Allstate Insurance Company (hereinafter Allstate) was also named as a defendant in its capacity as plaintiff's own uninsured/underinsured motorist carrier and as Sears' liability insurer.
*57 In their answer, State Farm and Simmons denied liability and asserted a crossclaim against Allstate and Sears, seeking indemnification and/or contribution. Sears and Allstate likewise asserted a crossclaim, naming State Farm and Simmons as defendants. After trial on the merits, the jury returned a verdict in favor of the plaintiffs in the amount of $263,150.59. The jury found both Sears and Simmons negligent and apportioned their fault at 99% and 1% respectively. Sears and Allstate suspensively appeal. We affirm.

FACTS
On December 5, 1984, at approximately 1:00 P.M., plaintiff was on her way home from work, and was traveling south in the west lane of the two southbound lanes of traffic on Lake Street, a four-lane, two-way thoroughfare in the city of Lake Charles, Louisiana. There was a light drizzling rain falling and, after she stopped at the red light at the intersection of Lake Street and McNeese Street, her 1965 Ford Mustang was rear-ended by a 1973 Ford Pickup Truck driven by Simmons. According to plaintiff's testimony, she was stopped in traffic 45 seconds to a minute, waiting for the light to change, before her automobile was struck by Simmons. Simmons, who was also traveling south at the time of the accident, estimated he had been driving at a speed of approximately 20-25 miles per hour and was following plaintiff's vehicle at a distance of about 100 feet. As he approached the intersection, he saw the red light and observed the traffic beginning to stop. Thereafter, he removed his foot from the gas pedal and coasted for a few feet before applying his brakes. Simmons testified that, when he applied pressure to his brake pedal, the brakes failed. He then attempted to steer the truck into an unoccupied turning lane, but could not avoid the collision. As a result of the collision, plaintiff's car was pushed into a van, which was also stopped for the traffic light, eight to ten feet ahead of her.
Subsequent to the accident plaintiff initially experienced sore muscles for approximately one and one-half weeks. Plaintiff then became aware of a gradual numbing in the fourth and fifth fingers on her right hand. This condition progressed over a period of several weeks until she developed a claw hand. After extensive treatment and two operations, plaintiff was left with a 50% permanent partial loss of use of her right arm.
Simmons testified that eleven months prior to the accident, he noticed that his master brake cylinder had started leaking. On February 11, 1984, he drove his truck to Sears where Paul Bilbo, a Sears brake mechanic, made the necessary repairs.
After completing the job, Bilbo informed Simmons that Sears was having a brake special and that their brake jobs carried a lifetime warranty. Simmons stated he had not been experiencing any problems stopping his truck, however, since his brakes were ten years old, he decided to have them inspected.
Bilbo examined the brakes and found that the rear brakes were worn down to the rivets and that the front brakes were also worn. A complete brake job was performed and, after the truck was test driven, Bilbo assured plaintiff that "everything was working fine."
After leaving Sears, Simmons immediately noticed that he had to apply a lot more pressure on the brake pedal to stop his truck than he had been applying prior to the brake job.
Shortly afterward, Simmons returned to Sears and explained the difficulty he had been experiencing with his brakes. Simmons testified a different mechanic changed the front brake pads but did not check the rear brakes. He also stated that when he asked the mechanic whether there could possibly be something wrong with the rear brakes the mechanic laughed and said drum brakes were practically foolproof. The truck was test driven by Sears again and Simmons was informed that everything was all right.
Simmons testified he continued to drive the truck for the next eight months and then decided to bring his truck back to Sears in November, 1984 because he was *58 still having to apply too much force on the brake pedal to stop the truck.
On this visit, Simmons expressed his concern about the brakes to the shop manager, Joe Hebert, who agreed to personally conduct an inspection of the brakes. Hebert's inspection consisted of a five to ten minute test drive with Bilbo. As before, Sears found nothing wrong with the brakes.
Despite all of the assurances given to him by Sears, Simmons still was not convinced that his brakes were working properly. After the accident he performed a skid test and found that only the front tires left skid marks. On that same day, he jacked up the rear end of the truck and discovered that the rear wheels would spin freely, even after the brake pedal was pushed all the way down. Simmons stated he knew then that something was wrong with his rear brakes.
Simmons then decided to have his brakes inspected by Quality Brakes in Lake Charles, Louisiana. The shop foreman, Jerry Sweet, removed the rear wheels and brake drums and discovered the rear brakes were not working due to a faulty proportion valve. It was explained at trial that the proportion valve meters fluid from the master cylinder to each of the four wheel brake cylinders, which in turn pushes out the brake shoes onto the brake drums and cause the vehicle to stop.
After the brake problem was identified by Quality Brakes, Simmons returned to Sears and had the proportion valve replaced.
Plaintiff filed suit on July 24, 1985, alleging that the accident and her resulting injuries were caused solely by negligence on the part of Sears and its employees in failing to properly perform a brake job on the truck operated by Simmons, and particularly, in failing to locate and correct the problem with the brakes after numerous complaints from Simmons prior to the accident.
In the alternative, plaintiff alleged that the proximate cause of the accident was the joint and concurrent negligence of Sears and Simmons.
After a three day trial, the jury returned a verdict finding: (1) there was negligence on the part of Sears and Simmons and this negligence was a legal cause of the injuries sustained by plaintiff and her husband; (2) the apportionment of percentage of fault was 99% to Sears and 1% to Simmons; (3) the plaintiff, Patricia T. Streeter, suffered damages in the amount of $72,666.67 for past, present and future lost wages, $32,000.00 for cost of future household services $72,666.66 for past, present and future mental and physical pain and suffering and $72,666.67 for permanent disability; and (4) plaintiff's husband, Tommy L. Streeter, suffered damages in the amount of $5,000.00 for loss of consortium and $8,150.59 for past medical expenses incurred for treatment of plaintiff.
Defendants, Allstate and Sears, timely filed a Motion For Judgment Notwithstanding The Verdict and, in the alternative, asked for a remittitur or a new trial.
Plaintiffs also timely filed a Motion For Judgment Notwithstanding The Verdict seeking to have the jury award for lost wages increased because the only evidence regarding the employment potential of plaintiff and her economic wage loss was unrebutted. Additionally, plaintiffs contended that the award for future household services was excessively low in light of the unrebutted evidence presented, and that the amount awarded should also be increased in accordance with the evidence.
In written reasons for judgment, the trial court denied defendants' Motion for Judgment Notwithstanding The Verdict and for remittitur and for new trial. Addressing the issue of plaintiff's lost wages, the trial court found that the "evidence was totally uncontradicted" and increased the award from $72,666.27 to $110,786.32 for past, present and future lost wages. The trial court also found the evidence with regard to the cost of future household services was uncontradicted; however, the trial judge determined "the testimony presented was not so structured or stated to where a person or persons would be required on a daily basis to care for the household services; therefore, a jury could choose to believe *59 that less than a forty ($40.00) dollar per day figure" was sufficient.
An amended judgment reflecting the additur with regard to past, present and future lost wages was signed. Defendants, Sears and Allstate, timely appealed suspensively. No other parties have appealed.
Prior to considering the merits, we will first consider the following procedural issues, urged by Sears and Allstate on appeal, in order to determine whether the trial court committed reversible error, which are:
(1) Whether the trial judge erred in refusing to give a requested jury charge on the failure to use the vehicle's emergency brake when the vehicle's foot brakes failed;
(2) Whether the trial judge erred in using a verdict form which precluded the jury from finding that the collective fault of the defendants could be less than 100% with an unnamed defendant being responsible for a residual percentage of the fault;
(3) Whether the trial court erred in not allowing into evidence the pre-trial deposition of Dr. Dale Bernauer after he was cross-examined by defense counsel concerning prior inconsistent statements in his deposition;
(4) Whether the trial judge erred in not granting a mistrial after the plaintiff's attorney introduced evidence that Sears had paid some of the property damages sustained by the Simmons truck;
(5) Whether the trial judge erred in allowing plaintiff's counsel to introduce evidence during closing argument and to use a mathematical formula in asking the jury to award damages; and
(6) Whether the trial judge erred in granting a Motion For Judgment Notwithstanding The Verdict and increasing the jury's award for plaintiff's past, present and future lost wages from $72,666.27 to $110,786.32.

FAILURE TO GIVE A REQUESTED JURY CHARGE
For the first time on appeal, defendants question the trial judge's refusal to instruct the jury regarding the standard of care imposed on motorists to use emergency brakes when ordinary foot brakes fail.
A review of the record discloses that, after the judge charged the jury and they retired for deliberations, there were some objections made to parts of the jury charges. However, none of the objections pertained to the failure to give a jury charge about use of an emergency brake.
At the time of the trial, LSA-C.C.P. Art. 1793(C) provided in pertinent part:
"C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds for his objection. Opportunity shall be given to make the objection out of the hearing of the jury."
It is well settled that a party cannot claim improper jury charges as error where he fails to object to the charges prior to the jury retiring to consider its verdict. Wright v. State Farm Mut. Auto. Ins. Co., 445 So.2d 206 (La.App. 3 Cir.1984); Ryals v. Home Ins. Co., 410 So.2d 827 (La.App. 3 Cir.1982), writ denied, 414 So.2d 375 (La. 1982). See also, Johnson v. H.W. Parson Motors, Inc., 231 So.2d 73 (La.App. 1 Cir. 1970). Since defendants' counsel did not object to the trial judge's failure to give a jury instruction regarding plaintiff's failure to use his emergency brake after his ordinary foot brake failed, prior to the jury retiring to consider the verdict, this assignment of error has no merit.

VERDICT FORM
Defendants claim that they were prejudiced by the failure of the trial judge to submit to the jury interrogatories addressing the possibility of negligence on the part of the truck manufacturer.
LSA-C.C.P. Art. 1812 provides that the court must inform the parties of the special verdict form and instructions it intends to submit to the jury within a reasonable time prior to their argument to the *60 jury. If an issue of fact raised by the pleadings or by the evidence is omitted, the parties waive their objection, unless they raise the issue before the jury retires. St. Pierre v. General Am. Transp. Corp., 360 So.2d 595 (La.App. 4 Cir.1978), writ denied, 362 So.2d 1386 (La.1978).
The record discloses that counsel for defendants did not make an objection to the trial court's proposed verdict form until after the jury retired for deliberation. Thus, by their failure to timely object, counsel for defendants have also waived their right to raise this issue on appeal.
Assuming, for the sake of argument, that the objection was made timely, our disposition of this issue would be the same since the issue of any third party negligence was not raised by the pleadings nor was there any evidence presented at trial tending to show negligence on the part of the truck manufacturer or any other third party.

EXCLUSION OF DEPOSITION TESTIMONY
At trial counsel for Sears and Allstate sought to introduce into evidence the pretrial deposition of plaintiff's treating physician, Dr. Robert Bernauer, after repeated references were made to the pre-trial deposition during cross-examination in an attempt to impeach his testimony regarding causation of plaintiff's injuries. Plaintiff's counsel objected to its admission on the grounds that the witness was present in court to testify and that the pre-trial deposition had been used for the purposes intended. The trial judge denied defendants' request, but allowed the pre-trial deposition to be proffered in evidence. Defendants argue it was prejudicial error not to allow the introduction of this pre-trial deposition and for this reason that this court should reverse the trial court's judgment.
LSA-C.C.P. Article 1450 expressly provides for the admissibility of any deposition to impeach a deponent's credibility at trial;[1] nevertheless, the decision of whether or not to allow the introduction of a deposition into evidence rests within the sound discretion of a trial judge and will not be reversed on appeal unless it is manifestly erroneous. Chaudoir v. Chaudoir, 454 So.2d 895 (La.App. 3 Cir.1984); Schneider v. Proctor and Gamble Mfg. Co., 411 So.2d 669 (La.App. 4 Cir.1982); Harrison v. State, Dept. of Highways, 375 So.2d 169 (La.App. 2 Cir.1979).
In Harrison, supra, the Second Circuit construed LSA-C.C.P. Art. 1450 and held that it is not an abuse of discretion for a trial court to refuse to admit into evidence the deposition of an adverse party when it is repetitious of matters contained in the record and serves no other purpose.
We find this rationale applicable in the instant case. Dr. Robert Bernauer testified on behalf of the plaintiffs as an expert in the field of orthopedic surgery. He stated that he treated plaintiff after her accident, and that he diagnosed her ailment as an ulnar nerve compression syndrome, which he described as a compression of the ulnar nerve at the elbow. He further stated, given the description of the accident and mechanism of injury offered to him by plaintiff, it is more probable than not that the accident caused her problem.
On cross-examination counsel for Sears and Allstate used Dr. Bernauer's pre-trial deposition to try to show that his trial testimony was inconsistent with statements made during his pre-trial deposition, which indicated that he could not with any degree of medical certainty say plaintiff's complaints were related to the accident of December 5, 1984. Prior to defendants' attempt to introduce the pre-trial deposition, Dr. Bernauer's previous statements, made *61 during his pre-trial deposition, were read verbatim into the record, and he admitted making the statements read from his pretrial deposition.
We find the jury had an opportunity to review all the pertinent evidence during trial and to assess the credibility of Dr. Bernauer. We conclude that the trial court did not abuse its discretion by excluding Dr. Bernauer's deposition from evidence.
Furthermore, even had it been error for the trial court to exclude the deposition, that error would have been harmless. Our review of the proffered deposition reveals that Dr. Bernauer's statements were not inconsistent as alleged by defendants. Dr. Bernauer explained during cross-examination at trial that he didn't know the mechanism of injury at the time of the taking of his deposition. His testimony was corroborated by plaintiff. When asked what she told Dr. Bernauer about her accident, she replied as follows:
"A. I had said that I had had an accident. But Dr. Bernauer really didn't go into any details of asking me any questions; and I didn't sit and just volunteer a deep history of what had really gone on; but I did say that I had been in an accident."
Dr. Bernauer was not fully informed of the details of plaintiff's accident until six days after the taking of his pre-trial deposition, when a hand written note from plaintiff was delivered to him by her attorney. In her handwritten note received in evidence, plaintiff gave the following description of her accident:
"I was stopped at a red light on Lake Street on December 5, 1984. I looked in the rearview mirror and saw an orange truck coming up on me turning sideways in the road. He was approximately 30-40 ft. away. I grabbed the steering wheel of the car and put one foot on the brake and the other on the clutch and braced myself hard for impact. When hit in the rear, I held on to the steering wheel and was pulled back into the seat. My neck popped backwards and also pulled my arms hard. I broke the steering wheel and horn on the car.
Then I was pushed forward in the car and hit a van in front of me. I flew up into the steering wheel, still holding on tight with my hands. I fell back afterwards and hit my right hip on the console.
When it was all over, I was still holding the wheel and somewhat dazed, burning all over.
About 1 ½-2 wks. passed and I started having numbness and pain in my right hand and arm. I was dropping things and had no strength in my right arm and hand. It was then I saw Dr. Nagem and then Dr. Shamieh.
I was not having any problems with my hand or arm until the wreck. I have not been in any wrecks until December 5, 1984.

Patricia Streeter"
This description was similar to that given by plaintiff at trial and in her pre-trial deposition taken on May 15, 1986, five months before the taking of the pre-trial deposition of Dr. Bernauer.
At trial, Dr. Bernauer testified that before his pre-trial deposition, he was not informed of the fact that plaintiff's vehicle was pushed into the van ahead of her. He further testified that this fact was crucial because of his opinion that the symptoms displayed by plaintiff are usually indicative of a stretch injury to the ulnar nerve or surrounding tissue and, from his impression of how the accident occurred before he gave his pre-trial deposition, there was no suggestion of her elbows bending.
This assignment of error is also meritless.

TRIAL COURT'S REFUSAL TO GRANT A MISTRIAL
During Simmons' cross-examination by plaintiff's counsel, the following colloquy took place regarding the payment of repairs to his truck:
"Q. Did they charge you anything for replacing that proportion valve in your truck?
A. No, sir, not a penny.

*62 Q. Was your truck damaged in this wreck?
A. Yes, sir.
Q. Did you have it repaired?
A. Yes, sir, I did.
Q. Who repaired it?
A. Sears paid to repair it."
Defendants objected to this line of questioning and requested that a curative instruction be given to the jury. The court sustained the objection and admonished the jury to disregard any testimony regarding payment by Sears for any damages done to Simmons' truck as either proof or admission of liability on the part of Sears.
Defendants then moved for a mistrial, claiming the jury heard irrelevant evidence intended to prove a fact which was at issue in the case. After hearing argument on the motion for mistrial, the trial judge denied the motion.
Defendants contend that the introduction of this evidence was prejudicial and grounds for a mistrial and for this reason that this Court should reverse the trial court's judgment.
Although the Code of Civil Procedure does not expressly provide for a mistrial, broad discretion is vested in a trial judge to grant such a motion where no other remedy would afford relief, or where circumstances indicate that justice may not be done if the trial continues. LSA-C.C.P. Arts. 191, 1631; Spencer v. Children's Hosp., 432 So.2d 823 (La.1983); 58 C.J.S. Mistrial, pp. 833-834 (1948).
In Wexler v. Martin, 367 So.2d 111 (La. App. 4 Cir.1979), writ denied, 369 So.2d 1352 (La.1979), the court was presented with the same argument. The issue was addressed in the following manner:
"Evidence of payment of some damages by the alleged tortfeasor is completely irrelevant to any issue in this case and should have been excluded. As is the case with any irrelevant evidence, the problem is that this evidence appears to the jury to prove something that it does not actually prove, namely, that defendants were liable for the accident. However, the issue of liability, although contested in the trial court, is now conceded on appeal.
Defendants argue, nevertheless, that evidence of this apparent admission of liability prior to trial by a party contesting liability at trial had a prejudicial effect on the jury which set quantum. While not passing specifically on this doubtful argument, we note that any prejudicial effect on the jury was cured by the trial judge's admonition in admitting the evidence that the payment was not to be considered as an admission of liability." Wexler v. Martin, 367 So.2d 111, at page 115 (La.App. 4th Cir.1979).
We are of the opinion that the trial court did not abuse its discretion in refusing to grant defendants' motion for a mistrial after the judge's admonition to the jury. The admonition requested by defendants was given by the court and was a sufficient remedy to overcome any prejudicial effect on the jury.

PLAINTIFF'S CLOSING ARGUMENT
During the course of his closing argument, plaintiffs' counsel told the jury plaintiff wanted them to know that she felt Simmons' fault should be zero. Counsel also told the jury that Simmons' trial testimony was credible because it was consistent with statements repeatedly made by Simmons outside of the courtroom. Sears and Allstate objected to these assertions on the basis that the plaintiff was attempting to introduce evidence by argument that was not introduced in the trial before the jury. The objections were summarily overruled by the court.
On appeal, defendants argue these comments unduly influenced the jury's decision and that this requires a new trial.
In Bourque v. Gulf Marine Transp., Inc., 480 So.2d 337 (La.App. 3 Cir.1985), this court summarized the law governing argument before a civil jury as follows:
"The propriety of argument in a civil jury trial must be determined in the factual light of the particular matter, the conduct and atmosphere of that particular trial and the arguments of opposing *63 counsel. Luquette v. Bouillion, 184 So. 2d 766 (La.App. 3rd Cir.1966). Great latitude is permitted in argument before a civil jury, subject to regulation by the trial court whose duty is to confine argument within proper bounds. Temple v. Liberty Mutual Insurance Company, 316 So.2d 783 (La.App. 1st Cir.1975), reversed on other grounds, 330 So.2d 891 (La.1976); Luquette, supra. Unless the contrary is shown, the trial court's ruling regarding alleged improper argument are presumed to have been made within the trial court's discretion. Luquette, supra." Bourque v. Gulf Marine Transp., Inc., 480 So.2d 337, at page 342 (La.App. 3 Cir.1985).
In applying these principles to the facts of this case, we find that the remark pertaining to Simmons' negligence was not prejudicial in nature when viewed within the context of the entire record. The comment was merely a restatement of allegations set forth in plaintiffs' petition and summarized the theme of plaintiffs' case on liability. After making the contested statement, plaintiffs' counsel pointed out to the jury that, although Sears was the primary defendant, Gordon Simmons, should be found at fault if Sears was not found at fault. It is apparent, from the responses to the interrogatories included in the verdict form, that the jury chose to disregard these comments and allocated fault to both defendants. Defendants have failed to show that the trial court abused its discretion in allowing this line of argument.
On the other hand, we find that defendants' objection to the statement that Simmons' story has remained consistent should have been sustained since it was a matter not in evidence. Washington v. Lake City Beverage, Inc., 352 So.2d 717 (La.App. 3 Cir.1977). Notwithstanding the fact that the statement was improper, we are of the opinion that a new trial is not warranted on this basis. After closing arguments were completed, the trial judge specifically charged the jury that the arguments by the attorneys was not evidence. Any prejudicial effect that plaintiffs' closing argument may have had on the jury was eradicated by the trial court's instructions. See e.g., Hebert v. Dominque, 473 So.2d 120 (La.App. 3 Cir.1985), writ denied, 477 So.2d 708 (La.1985); Carver v. Cabiro, 381 So.2d 969 (La.App. 4 Cir.1980), writ den., 383 So.2d 782 (La.1980); Washington, supra.
Defendants also complain that the trial court erred in allowing plaintiffs' counsel to base his argument for damages on a "unit of time" formula and that this error requires a new trial.
Our review of the pertinent jurisprudence reveals that there is a conflict among our circuits regarding the propriety of using a mathematical formula to argue the monetary value of general damages before a jury. In Hebert v. Travelers Insurance Company, 245 So.2d 563 (La.App. 3 Cir. 1971), writ den., 258 La. 903, 248 So.2d 332 (1971), this court summarized the jurisprudence and methodology generally associated with this type of argument as follows:
"Under this method, it is determined what the plaintiff's pain and suffering is worth in monetary terms for a given unit of time and then that figure is multiplied by the number of the said units of time contained in the expected duration of the pain and suffering. Thus a final figure is arrived at which supposedly represents a reasonable picture of what the amount of general damages should be. Although our Supreme Court has generally rejected the use of mathematical formulae in the determination of the amounts of damages, Pennington v. Justiss-Mears Oil Co., 242 La. 1, 134 So.2d 53 [1961]; McFarland v. Illinois Central Railroad Co., 241 La. 15, 127 So.2d 183 [1961], the unit-of-time argument was approved by our brothers of the First Circuit in Little v. Hughes, La.App., 136 So.2d 448 [1961] ..." Hebert v. Travelers Insurance Company, 245 So.2d 563, at page 565 (La.App. 3 Cir.1971), writ den., 248 So.2d 332 (La.1971).
The plaintiff's contested argument to the jury is as follows:
"[I]'m going to try to give you some guidelines. I want you to imagine that tomorrow morning you pick up the newspaper *64 and you look in the want ads and they have a job ad in there that says: Wanted to Hire: One Hundred dollars per day; no forms to fill out; no duties; no responsibilities; you don't have to agree to show up for work; you have to do nothing, except you must agree to suffer pain for the rest of your life; you must agree to suffer numbness in your dominant hand for the rest of your life; and you must agree to suffer 50 per cent permanent disability in your dominant hand for the rest of your life. And more so than that, once you sign up for this job, once you agree to take it, you've got it for life; it's seven days a week, 24 hours a day for the rest of your life, which is, by Dr. Cornwell's figures, 40 years in this case."
In this case, we see no need to enter into a protracted discussion of whether or not the argument presented by plaintiffs' counsel was in contravention of the jurisprudence. The record discloses that the statements were objected to by defendants as an improper measure of damages argument. In response to the objection, the trial judge cautioned plaintiffs' counsel to limit his argument in this area. We are of the opinion that this ruling was proper and served to negate any prejudice created in the minds of the jury especially in light of the trial judge's instruction to the jury concerning arguments of counsel.
Furthermore, as noted in plaintiff's brief, an examination of the jury's verdict reflects that the jury did not use the suggested mathematical formula in awarding damages for pain and suffering, as its award for that item was only $72,666.67. This assignment of error also does not have any merit.

JUDGMENT NOTWITHSTANDING THE VERDICT
Defendants also argue that the trial judge erroneously granted a judgment notwithstanding the verdict, increasing the jury's award for lost wages from $72,666.27 to $110,786.32.
The rule governing a motion for judgment notwithstanding the verdict is found in LSA-C.C.P. Art. 1811, which provides in pertinent part:
"A. (1) Not later than seven days, exclusive of legal holidays, after the signing of the judgment, or if notice of the signing of the judgment is required under Article 1913, not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice, a party may move for a judgment notwithstanding the verdict. If a verdict was not returned, a party may move for a judgment notwithstanding the verdict not later than seven days, exclusive of legal holidays, after the jury was discharged.

* * * * * *
F. The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues."
In cases where the trial judge finds that the jury has returned a legally erroneous verdict, he is empowered to reapportion the fault and amend the amount of damages assessed by the jury, if the proper standard is met. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2 Cir.1987).
This court, in the case of Webb v. Goodley, 512 So.2d 527 (La.App. 3 Cir.1987), set forth the well-established standard of proof that must be met before a motion for judgment notwithstanding the verdict can be granted by a trial judge:
"La.C.C.P. art. 1811 does not specify the grounds on which the trial judge may set aside a jury verdict, but the jurisprudential criterion is well settled. A judgment N.O.V. may only be granted when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict on the facts at issue. * * * Alumbaugh v. Montgomery Ward & Company, Inc., 492 So.2d 545 (La. App. 3d Cir.), writ denied, 495 So.2d 304 (La.1986); Rougeau v. Commercial Union Insurance Company, 432 So.2d 1162 (La.App. 3d Cir.), writ denied, 437 So.2d 1149 (La.1983). Further, the trial court may not weigh the evidence, pass on the *65 credibility of the witnesses, or substitute its reasonable inferences of the facts for those of the jury. Id, at 1166. As a reviewing court, we must determine whether the trial judge's conclusions as to damages and liability for penalties and attorney's fees were manifestly erroneous. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (La.1985)." (Footnote omitted.) Webb v. Goodley, 512 So.2d 527, at page 530 (La.App. 3 Cir.1987).
See also, Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986); Bellard v. CNA Ins. Co., 503 So.2d 1104 (La.App. 3 Cir. 1987), writ denied, 506 So.2d 1228 (La. 1987).
With these standards in mind, we must review the evidence presented by plaintiffs to determine whether or not the trial judge committed manifest error.
The record reflects that the only expert testimony addressing the plaintiff's employment potential and wage loss was presented by plaintiffs. Plaintiffs' first witness on this issue was Mr. Jay Hubbard, who was tendered and accepted by the court as an expert vocational consultant. At the request of plaintiffs' counsel, Hubbard performed an evaluation of plaintiff for the purpose of determining her employment prospects. Hubbard testified that, based on his review of plaintiff's educational background, employment history, and medical reports, he believed plaintiff would be unable to return to a position within the scope of her training and that she possessed no transferable skills that would allow her to enter into an alternate area of employment on a direct entry level basis.
On cross-examination, Hubbard admitted that he had not done a labor market survey to determine job availability in the Lake Charles area; however, he explained this was not done because it would not be "advantageous or really be productive," given the extent of plaintiff's disability.
Mr. Donald W. Cornwell, a consulting economist, also testified on behalf of plaintiffs. Cornwell stated that he was hired by plaintiffs to do a projection of plaintiff's wage loss. He estimated that, assuming plaintiff is no longer able to return to the labor force, her lost wages to date of trial, together with future wage loss, would total $223,852.63. He also testified that the latter figure would be reduced to $110,716.32, if plaintiff returned to full time employment at minimum wage one year from the date of trial.
In support of their position, defendants cite several cases holding that the finder of fact is not bound by expert testimony. While we agree with this general statement of the law, the jurisprudence also provides that uncontradicted testimony of a witness should be accepted as true, absent a sound reason for its rejection. Johnson v. Ins. Co. of N. America, 454 So.2d 1113 (La.1984); Louisiana Power & Light Co. v. Roberts, 408 So.2d 49 (La.App. 3 Cir.1981), writ den., 412 So.2d 1111 (La. 1982).
We find no relevant evidence upon which the jury could have reasonably inferred that plaintiff would be able to return to employment at a greater pay than minimum wage. Accordingly, we cannot say that the trial judge was manifestly in error in granting plaintiffs' Motion For Judgment Notwithstanding The Verdict and increasing the jury's award for plaintiff's lost wages from $72,666.27 to $110,786.32.
Having determined that the various procedural ruling by the trial court did not create reversible error, we now address the substantive issues presented on appeal.

ALLOCATION OF FAULT
The defendants argue that the jury's assessment of only 1% fault to Simmons was contrary to the law and evidence.
At the onset, we must note that a trier's finding as to degree of fault is a factual matter and should not be disturbed on appeal, unless the record establishes that the finding was clearly wrong or an abuse of discretion. Courmier v. Travelers Ins. Co., 486 So.2d 243 (La.App. 3 Cir. 1986), writ denied, 489 So.2d 250, 251 (La. 1986).
*66 The record reveals that there is ample and credible evidence to support the jury's allocation of negligence. Plaintiff's expert witness, Jerry Sweet, testified via deposition that, in his opinion, the rear brakes had not worked on Simmons' truck since Sears installed the new brake shoes and turned the drums. He explained that this determination was based on his discovery of rust around the drums, which evidenced the lack of contact between the shoes and the drum, and his observation that the surface of the brake shoes showed no signs of wear nor of having ever been seated in the drums. In the course of his inspection he also found that there was a complete lack of brake fluid at the rear wheel cylinder and in the proportion valve. Sweet also testified that a complaint of the truck requiring more brake foot pedal pressure to bring it to a stop would be consistent with a malfunctioning proportion valve and that in his experience, proportion valves, if they are going to fail, generally fail at a time when the system is "open" as a result of somebody working on the brakes. It was his opinion that air entered the system when Sears originally worked on the brakes and that this air caused the valve to stick and rust, preventing brake fluid from reaching the rear brakes. Finally Sweet testified that Simmons' truck, as he found it with the rear brakes not working, would stop, but that it could not stop as quickly as it would had all four brakes been working.
Sears' employee, Paul Bilbo, testified as an expert brake mechanic on their behalf. While Bilbo did not disagree with Sweet's finding that a proportion valve caused the brake failure, he did disagree on when the malfunction arose. Bilbo recalled that the truck "drove differently" in November, 1984 than it did in January, 1985, when Simmons returned his truck to have the valve changed. Also, he recalled examining the brakes on the latter date and noticing "they were worn some." Based on these observations and the presence of a thin film of rust, he concluded that the proportion valve had only recently failed.
During trial the accuracy of Bilbo's memory was called into question. On cross-examination, Bilbo was read a portion of his pre-trial deposition taken one year earlier, in which he stated he could not specifically remember working on Simmons' truck or the condition of its rear brakes. When asked how his memory had improved in the interim, Bilbo replied that after sitting in court all week and hearing the testimony he could "remember just doing the truck yesterday."
Perhaps the most revealing evidence of negligence on the part of Sears arose out of the following colloquy between Sears' attorney and Bilbo, when Bilbo was asked to summarize the procedure used in examining Simmons' vehicle after the accident:
"Q. And when he brought it back, did you look at it?
A. Not before the accident.
Q. This is after the accident.
A. After the accident, yes sir.
Q. Did you look at the truck then?
A. We checked it.
Q. And how did you go about rechecking it then? What did you you do?
A. Took it up, took all the wheels off and the drums.
Q. Why did you do that?
A. That's the only way you can really check."
(Emphasis added.)
Later, Bilbo admitted that the whole procedure could be accomplished in only five minutes.
Defendants make much of the fact that Simmons failed to use his emergency brake when faced with the loss of his foot brake. They argue even if the evidence shows their actions were negligent, Simmons' failure to use the emergency brake was the proximate cause of the accident and the jury erred in not finding him 100% at fault.
The jurisprudence in this state is settled that the failure of a motorist to use his emergency brake constitutes negligence and a cause of the accident if there is a reasonable opportunity to do so effectively after the foot brake fails. LSA-R.S. 32:341; Towner v. Milligan, 234 So.2d 500 (La.App. 3 Cir.1970); Cartwright v. Firemen's *67 Ins. Co. of Newark, N.J., 213 So.2d 154 (La.App. 3 Cir.1968), affirmed, 254 La. 330, 223 So.2d 822 (1969).
The record does not reveal how much time elapsed between the failure of the brakes and the occurrence of the collision; however, from Simmons' description of the accident, it does not appear that there was much more than a few seconds interval.
When Simmons was asked whether or not he had sufficient time within which to use his emergency brake, he replied as follows:
"Well, the way the accident happened, when I first tried to apply the brake and found out the truck wouldn't hold, natural instinct was to let off the brake and try it again, and still couldn't get it to hold, and by that time I was approaching her; and my next instinct was to try to steer into that center turning lane to get away from her; and when that failed, no, sir, there wasn't time to try anything else. The only things I knew to try had done failed and I had run out of time. It was too late."
In retrospect, we can see that Simmons could have perhaps taken a better course of action in his attempt to avoid the accident and that the course of action taken by Simmons contributed to the accident. Whether or not Simmons had sufficient time under the circumstances to use his emergency brake was a question of fact that the jury apparently decided against Simmons' as the jury decided his actions constituted 1% of the fault which also caused the accident.
We do not find that the jury was clearly wrong in finding fault on the part of Sears or Simmons which was a cause of the accident. The evidence does establish that Sears negligently repaired Simmons' truck brakes and that Simmons might have had an opportunity to use the emergency brake after his foot brake failed.
For this reason we conclude that the jury allocation of 99% of the fault to Sears and only 1% of the fault to Simmons was not clearly wrong.

CAUSAL RELATIONSHIP OF INJURIES TO ACCIDENT
Defendants contend plaintiff failed to show by a preponderance of credible evidence that her ulnar nerve injury was causally related to the accident and, therefore, the jury's damage award was excessive. In support of their contention, defendants argue that the medical testimony overwhelmingly indicates that the appearance of symptoms one and one-half to two weeks after the accident make it highly improbable that the ulnar nerve had been injured in the accident.
In a personal injury suit the test for determining the causal relationship between the accident and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by trauma suffered in the accident. Mart v. Hill, 505 So.2d 1120 (La. 1987), on remand, 513 So.2d 1235 (La.App. 4 Cir. 1987), writ den., 515 So.2d 1108 (La.1987); Aucoin v. State Farm Mut. Auto. Ins. Co., 505 So.2d 993 (La.App. 3 Cir.1987). A plaintiff is aided in establishing this burden by the legal presumption that a medical condition producing disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, but shortly after the accident, the disabling condition manifested itself. Heath v. Northgate Mall, Inc., 398 So.2d 132 (La.App. 3 Cir.1981); Boykin v. Washington, 401 So.2d 488 (La.App. 2 Cir.1981).
If such a showing is made, the burden is upon a defendant who contests the cause-in-fact relationship to show some other particular incident could have caused the injury in question to overcome plaintiff's case. Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.App. 2 Cir. 1986); Miller v. Allstate Insurance Company, 221 So.2d 908 (La.App. 1 Cir. 1969).
Plaintiff initially sought treatment for her right arm on January 8, 1967. On that date, she visited her family physician, Dr. Edmund Nagem, with complaints of a tingling sensation in her fourth and fifth right fingers. Because he felt she needed a specialist, *68 Dr. Nagem referred plaintiff to a neurologist, Dr. Fayez Shamieh.[2]
Dr. Shamieh treated plaintiff for the first time on January 15, 1985. She was given an EMG (electromyogram)[3] and it was found that there was an abnormal delay in the conduction of the electricity across plaintiff's elbow in her ulnar nerve.[4] This indicated to him that the ulnar nerve was injured.
Dr. Shamieh prescribed Motrin and Toletin, anti-inflammatory drugs, and Vitamin B1 (Thiamin) to aid the healing process of the nerve. She was also instructed to wear a sling.
On March 7, 1985, Dr. Shamieh repeated the EMG and found that there was a decrease in the nerve velocity across the elbow, indicating a deterioration of the ulnar nerve. Dr. Shamieh testified that the initial injury and subsequent deterioration were most likely caused by the accident. Because conservative treatment failed to improve her condition, Dr. Shamieh referred plaintiff to Dr. Bernauer.
Dr. Bernauer examined plaintiff on March 11, 1985. At trial Dr. Bernauer testified that he obtained a copy of Dr. Shamieh's EMG studies from plaintiff, and because the results showed her condition was worsening, he recommended surgery to alleviate pressure on the nerve. Surgery was performed on March 26, 1985. After the operation, plaintiff was given pain medication and placed in a half cast for six weeks.
Another EMG was performed on August 20, 1985, to determine whether the surgery yielded positive results. The EMG showed there was still some abnormality in the ulnar nerve so a second surgery was performed on September 20, 1985.
Dr. Bernauer released plaintiff on September 8, 1986, with an assessed 50% permanent partial disability to the right arm. Dr. Bernauer testified that, based on plaintiff's history of the accident, it was more probable than not that her injuries were causally related to the December, 1984 accident. Dr. Bernauer gave the following testimony regarding the probable cause of disability and the "mechanism of injury" that would produce such an injury:
"Q. Doctor, given the history and the accident as she reported it to you, and assuming that she had no prior problems with her arm prior to this accident, no problems with her arm prior to this accident whatsoever, do you have an opinion as to whether or not the accident caused the problem that she has with her right arm?
A. Yes, it did.
Q. And in terms of more probably than not, can you tell us what that opinion is?
A. Given the history of the accident as given to me by Mrs. Streeter and the mechanism of injury, it's more probable than not that the accident caused her problem.
Q. What, if you will ... Make it clear to the jury. Just what is the mechanism of injury that you now understand that Mrs. Streeter sustained in this accident?
A. The mechanism of injury that she described to me was that she saw the wreck about to happen, she grabbed hold of the steering wheel *69 and braced herself on it with her arms extended, was hit in the back, and this caused her to pop backwards, popped her neck backwards and stretched her arms; and at that time she struck the car in front of her; and when she did that, that threw her forward into the steering wheel, flexing her arms very quickly and strongly, pushing her and bringing her arms back like this.
Q. Would such a mechanism of injury be sufficient to produce the injury that she had?
A. Yes, sir."
As shown by the following testimony, Dr. Bernauer also felt that the decrease in nerve velocity across the elbow between the first and second EMG was an indication that the cause of her problem was recent acute trauma:
"Q. Doctor, if I understood you correctly, you said that her EMG showed a decrease in nerve velocity across the elbow and the ulnar nerve from the first EMG to the second EMG?
A. Yes.
Q. Is that significant in any way?
A. Yes. It indicates a worsening problem.
Q. Does that have any bearing on your opinion as to whether or not her injury was a result of that car accident?
A. I would think that in the short period of time between the two EMGS, for there to be worsening like that, that it would mean that the injury to the nerve was acute, not a chronic problem. I would not expect if you had a chronic problem for it to change over that short a period of time.
Q. By `acute', you mean some direct type trauma, such as a car accident?
A. Yeah, something that had happened a short time before.
Q. Did you ask her if she has ever had any problem with her right arm before this car accident?
A. Yes.
Q. What did she indicate to you?
A. That she did not.
Q. Did she ever give you any history of having been involved in any other type of accident or trauma of any type since this automobile accident?
A. No."
On cross examination, Dr. Bernauer pointed out that acute trauma to a nerve can result from a direct blow type injury or if a nerve is overstretched. He also explained that, if a nerve is stretched, there usually will be only numbness and no immediate signs of pain or injury, unless the nerve is torn. Dr. Bernauer further stated that, depending on the degree of stretch, it would not be uncommon for an injury of this nature to manifest itself gradually over a period of two weeks, as it occurred with plaintiff.
At the request of the defendants, plaintiff was examined by Dr. John Raggio, a Lake Charles neurosurgeon, in September, 1985 and again in August, 1986.
A review of Dr. Raggio's trial testimony shows that he gave a conflicting opinion regarding the issue of causation. Dr. Raggio testified on direct examination that he found only minimal atrophy (shrinkage of the muscles) in plaintiff's right hand, which indicated to him that the disruption of the nerve supply was minimal. Because plaintiff's history of the accident included a reference to immediate pain in the area of her elbow, he was reluctant to say it was the specific cause of her nerve injury.
On cross examination, Dr. Raggio did agree with Dr. Bernauer that an ulnar nerve compression syndrome can be caused by a stretching type injury to tissues or muscles surrounding a nerve, and in such cases, there is typically a gradual onset of symptoms sometime after the initial trauma. He also added that plaintiff was cooperative, showed no signs of malingering, and he had no reason to doubt her story.
When asked to assume that plaintiff had no problems with her right arm prior to the accident, that the EMG showed a lesion in *70 her ulnar nerve, and plaintiff began having problems within a month after the collision, he opined that the accident more probably than not caused her injury.
On re-direct examination, however, Dr. Raggio explained that the use of a hypothetical question had confused him and that his prior statement did not reflect his true opinion.
In reaching a verdict, the jury apparently accorded greater weight to Dr. Bernauer's testimony. It is well settled that the testimony of an attending physician should be accorded more weight and probative value than that of a physician who has made an examination solely for the purpose of giving expert testimony regarding a patient's condition. Ray v. Home Indemnity Company, 313 So.2d 303 (La.App. 3 Cir.1975); Meche v. Maryland Casualty Company, 204 So.2d 719 (La. App. 3 Cir.1967), writ den., 251 La. 754, 206 So.2d 97 (1968).
In light of the foregoing testimony and evidence, we are of the opinion that the jury was not manifestly erroneous in the evaluation of the medical testimony nor in finding plaintiff's ulnar nerve problem was causally related to the accident. The evidence presented by plaintiff was more than sufficient to establish a prima facie case that she suffered a trauma in the accident and that her disability is a direct result of the trauma. In contrast, defendants failed to carry their burden of showing some intervening cause precipitated the injury in question or that plaintiff's condition preexisted the accident.[5] Consequently, we will not modify the jury's award for this injury.
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be paid by the defendantappellant, Sears.
AFFIRMED.
NOTES
[1] LSA-C.C.P. Art. 1450 provides in pertinent part as follows:

"At the trial or upon the hearing of a motion of an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness."
[2] Dr. Nagem testified that he has been treating Mrs. Streeter since 1973 and prior to the accident, she has never complained of problems with her right arm. Her employer, Dr. Kordish, also stated that plaintiff worked for him almost two years and she never complained to him of pain in her right arm. He recalled that she was always mobile and had good use of both hands.
[3] An electromyogram is a visual recording of the electrical changes produced by contracting annodes and is generally used to detect evidence of nerve damage. Schmidt 12 Attorneys Dictionary of Medicine, at page E-39 (1987). Dr. Shamieh described the procedure as follows: a stimulation is used to apply a mild electric shock to certain major nerves in the muscles. If there is a delay in the response, the physician knows something is wrong with the nerve.
[4] The ulnar nerve is commonly called the "funny bone." It comes behind the arm, across the bone found in a groove on the elbow, and gives sensation to two fingers, and also gives muscle power to all the small muscles of the hand and three muscles in the forearm.
[5] Defendants implied that plaintiff's injuries could have been caused by her participation in strenuous recreational activities such as hunting and shrimping, but they failed to present any direct evidence establishing this theory.