555 So.2d 472 (1989)
Fred McGOWAN
v.
The SEWERAGE AND WATER BOARD OF NEW ORLEANS, New Orleans Public Service, Inc., and the City of New Orleans.
No. 88-CA-0596.
Court of Appeal of Louisiana, Fourth Circuit.
September 28, 1989.
On Rehearing November 15, 1989.
*473 Timothy G. Schafer, Schafer & Schafer, New Orleans, for Lexington Ins. Co.
A. Remy Fransen, Jr., P. Chris Christofferson, Wiedmann & Fransen, New Orleans (Louis H. Schultz, Metairie, of counsel), for Fred McGowan.
Before BARRY, WARD and WILLIAMS, JJ.
WARD, Judge.
Lexington Insurance Company, as the excess insurance carrier for the Sewerage and Water Board, appeals a $2,000,000 personal injury award in favor of Fred McGowan. McGowan answers the appeal, seeking an increase in special damages and also appeals a declaratory judgment relieving Lexington Insurance Company of liability for payment of interest on the Board's primary self-insurance limits. We affirm the judgment of the lower court.
On November 11, 1981, at approximately 9:30 p.m., en route to his aunt's house from Red's Bar about a block away, McGowan, a 34 year old "mildly" retarded man, suffered facial injuries, contusions, and a compression injury to his cervical spine in an unwitnessed bicycle accident when he fell into an uncovered drainage catch basin in the curbing of Tennessee Street in New Orleans.
In addition to Lexington and the Board, McGowan sued the City of New Orleans as the owner of the catch basin and the New Orleans Public Service, Inc. (NOPSI) as the entity responsible for maintaining street lighting. The defendants third-partied and cross-claimed one another for indemnification and contribution.
Prior to trial the Sewerage and Water Board paid McGowan $500,000, its primary self-insurance limit. McGowan released the Board reserving his rights against Lexington to the extent of collectible insurance and agreed to allow Lexington a credit for the $500,000, less and except interest due thereon which McGowan claims Lexington now owes. During trial, the Board, NOPSI and the City stipulated that the Board was *474 responsible for maintenance of the City-owned basin under R.S. 33:4071 and that NOPSI was contractually bound to maintain street lighting.
After trial, the jury unanimously concluded that the catch basin was defective, that the defect caused McGowan's injuries, that McGowan was negligent in operating his bicycle and that the Board was negligent in failing to maintain the basin. The jury apportioned 82% of the fault for the accident to the Board and 18% to McGowan. NOPSI was exonerated.
McGowan received an award of $1,500,000 in general damages and $500,000 for special damages, subject to reductions for his negligence and the $500,000 pre-trial settlement. The Court entered judgment based on the verdict holding the Board, Lexington Insurance Company and the City of New Orleans solidarily liable for McGowan's injuries and ordered the Board to indemnify "the City for all sums for which the City is cast under the doctrine of strict liability."
In oral argument, Lexington concedes negligence by the Board[1]; however, appealing the lower court judgment, Lexington urges that the jury erred in finding that McGowan proved causation by a preponderance of the evidence.
At trial McGowan testified that after rounding the corner of Florida Avenue, he rode his bike on the sidewalk in a southerly direction toward his aunt's residence. A car parked in his aunt's driveway blocked his path, so McGowan changed his course, turned left to go out into the street and in doing so rode into the open basin. McGowan's mother, aunt and uncle testified that when they first came upon the accident scene, they found McGowan lying with his head, upper torso and bike on the ground on the sidewalk side of the basin with his lower body down in the basin.
Lexington Insurance Company introduced the testimony of an accident reconstruction expert, John Rigol. Mr. Rigol reconstructed the accident, relying on the testimony of McGowan's mother, aunt, and uncle. His analysis was based on the belief that McGowan's relatives were first on the scene, and that McGowan was in the position they found him which he believed to be immediately after the accident. Rigol testified that in his opinion, McGowan, contrary to his testimony, must have travelled from the street to the sidewalk and rode his bicycle from the street into the raised grill of the catch basin, causing him to fall into the open catch basin. Relying on principles of physics, Rigol explained that if the accident occurred as McGowan claimed, his head and upper body would have fallen onto the street side, not the sidewalk side, of the basin.
Lexington contends its expert's opinion proves McGowan hit the grill of the basin which faced the street and which stood 6.6 inches above the curb causing McGowan to fall from his bike. As more support for this assignment, Lexington notes that neither its expert neurosurgeon, Dr. Bert Bratton, nor Dr. William A. Martin, McGowan's expert neurologist, could unequivacally state how the injuries occurred. Both physicians testified McGowan's quadriparesis, weakness of all four extremities, resulted from a flexion-extension or "whiplash" motion, which conceivably could have occurred as a result of either version of the accident. If McGowan rode his bicycle into the grill, as Lexington argues, then the uncovered catch basin did not cause McGowan's injuries; rather, the injuries would have been caused solely by McGowan's negligence. Citing Townsend v. State Department of Highways, 322 So.2d 139 (La.1975), Lexington contends at the very least, the uncertainty in the evidence shows that McGowan failed to prove that the uncovered basin caused his injuries. We do not agree.
The testimony of various Board employees established that the catch basin measured approximately four feet in length, by *475 two feet in width and depth. In addition to McGowan's testimony, the jury heard the deposition testimony of John Washington, who said he was the first person on the scene of the accident. Washington said when he found McGowan clinging to his bike, the bike's front wheel and McGowan's head and shoulders were down in the basin. The back wheel was in the air with McGowan's legs still wrapped around the seat. Washington stated he removed McGowan from the hole, placed him on the side of the basin and then summoned help.
Not only does Washington's testimony corrobarate McGowan's version of the facts, it also casts doubt on Rigol's expert opinion because it was based upon an erroneous assumption that McGowan's family, not Washington, were first on the scene, and Rigol acknowledged the necessity of relying on "the testimony of those that found him." Because Rigol relied upon the family's testimony rather than Washington's, the jury may well have ignored his expert opinion.
At any rate, we cannot say the jury's finding is not supported by the record, or that it is manifestly erroneous, or that the jury erred in concluding that McGowan carried his burden of proof. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Lexington argues alternatively that the jury's assessment of McGowan's negligence at 18% is erroneous and should be increased to 50%. Lexington contends even if McGowan's version of the accident is the correct one, when McGowan decided to cut across the grass, an area not intended for vehicular traffic, rather than entering his aunt's paved driveway from the street, he failed to maintain a proper lookout, to see and avoid any dangers or obstructions which he should have seen by the exercise of reasonable care and to operate his bicycle in a proper manner under the circumstances. As a consequence of this negligence, Lexington argues McGowan is at least 50% at fault. Townsend, supra.
On the other hand, Board employees readily admitted a coverless catch basin presented a very dangerous condition. Other trial testimony indicated this condition persisted for a period of some three months in spite of area residents reporting the condition to the Board. The Board admitted there was no preventive maintenance program and there were no warning barricades around the open basin.
In determining percentages of fault, the trier of fact must consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). A trier's finding as to degree of fault is a factual matter and should not be disturbed on appeal, unless the record establishes that the finding was clearly wrong or an abuse of discretion. Courmier v. Travelers Ins. Co., 486 So.2d 243 (La.App. 3 Cir.), writ. denied, 489 So.2d 250 (La.1986). The record does not lead to a conclusion that the jury finding was clearly wrong.
Answering the appeal, McGowan claims the jury's $500,000 award of unspecified special damages is inconsistent with the proof adduced at trial, is an abuse of its discretion, and he seeks an increase in special damages from $500,000 to $1,934,075. The jury did not particularize the award of $500,000 for special damages. Obviously the jury rejected some, if not most, of McGowan's claims. The question raised by McGowan's answer, asking this Court to increase the award for special damages, is whether McGowan's proof is such that the jury acted unreasonably in rejecting these claims. McGowan offered the testimony of Terry Kennedy, Jewel Porter, Dr. Melville Wolfson and the deposition testimony of Dr. Robert Halvorsen to establish and support his special damages claims.
McGowan's medical history showed he sustained a compression of his cervical spine at the C-3,4 and C-4,5 levels resulting in a condition of quadriparesis, marked by weakness in all four extremities, partial paralysis and some loss of sensation. Additionally, he suffers with a neurogenic bladder, spasms of his arm and leg muscles and atrophy of his hand muscles. His legs are slightly stronger than his hands. However, *476 because of his spastic condition, he is not able to walk unassisted. The left side of his body is weaker than his right, but since McGowan is right handed, rehabilitation was geared to primary use of his right hand. He requires assistance in dressing, feeding himself and personal hygiene. The experts agreed he has an I.Q. of 58 to 60. In spite of his mental limitations, however, the family presented a pre-accident picture of McGowan as active and functional in his environment although heavily dependent on his family.
McGowan's mother and sister testified that he remained in school through the sixth grade and that he cannot read or write, dial a telephone, tell time or count large amounts of money. McGowan failed to present any formal work history. There was some testimony that he worked for an air-conditioning company for approximately one month but neither he nor his family could recall the company's name. Testimony indicated that he repaired lawnmowers and small appliances and sharpened knives for friends and neighbors. McGowan said he received pay for these services, but he could not provide any proof of income or suggest any amount.
Terry Kennedy, a physical therapist, treated McGowan at the Louisiana Rehabilitation Institute periodically from January through November 1982. Kennedy determined that McGowan's physical condition precluded any possibility of employment. Kennedy visited McGowan's home on two occasions observing that McGowan could get out of bed, partially dress himself, tie his shoes and feed himself after someone prepared his food. He indicated that McGowan required bathroom assistance.
Jewel Porter, the director of a home healthcare agency providing in-home nursing services, visited the McGowan home and made numerous suggestions for modifications or additions to the home which would facilitate McGowan's access and movement as well as enhance his comfort and safety. She also recommended a lift-equipped van to transport McGowan and she described the type of medical care and physical therapy he would require for the rest of his life. Ms. Porter's suggestions were based upon McGowan being a quadriplegic which she defined as a person having no use of their legs and limited use of their arms. She admitted she did not know McGowan was quadriparetic rather than quadriplegic and further, did not know the difference.
Dr. Melville Wolfson analyzed McGowan's costs of future maintenance and medical care and projected the present value of these costs based upon McGowan's 29.5 year life expectancy. He based his financial analysis on Dr. Robert Halvorsen's opinion of McGowan's needs as a result of the spinal injury. Dr. Wolfson also computed McGowan's past and future loss of earning capacity at $152,937.
Dr. Halvorsen, McGowan's expert on physical medicine and spinal injury rehabilitation found, after one consultation with McGowan and without benefit of his Charity Hospital records, that McGowan was able to walk short distances using a walker, but needed assistance to dress and to use the bathroom facilities because of an almost total lack of fine motor skills. He also concluded McGowan was unemployable and needed 24 hour care.
In contrast, Lexington Insurance Company presented the deposition testimony of Dr. Farid Nour, an expert with emphasis on physical medicine and rehabilitation, to refute Dr. Halvorsen's opinion. Dr. Nour was directly responsible for McGowan's care and rehabilitation at Charity Hospital and saw him approximately five times a week for three months. Dr. Nour testified that subsequent to McGowan's April 1982 discharge from the rehabilitation unit, McGowan showed a slight improvement of arm muscle strength with reduced spasticity. McGowan used his walker with greater frequency than his wheelchair but suffered increased contracture because of non-manipulation of his joints. Dr. Nour was of the opinion that McGowan needed only stand-by assistance, not daily skilled nursing care, and that his family was competently applying physical therapy skills.
In reaching a verdict, the jury apparently accorded greater weight to Dr. *477 Nour's testimony. The testimony of an attending physician, in this case Dr. Nour of Charity Hospital, should be accorded more weight and probative value than that of a physician who made an examination solely for the purpose of giving expert testimony. Streeter v. Sears, Roebuck and Company, Inc., 533 So.2d 54 (La.App. 3 Cir.1988), writ. denied, 536 So.2d 1255 (La.1989). We conclude it was not unreasonable for the jury to reject McGowan's claim of $1,125,572 for 24 hour custodial care based on Dr. Nour's testimony.
Nor can we say the jury acted unreasonably if it rejected McGowan's claim of $152,937 for past and future loss of earning capacity. Before a plaintiff can recover damages for loss of earnings, past or future, he must show with some degree of reasonable certainty what he would have earned if he had not been involved in the accident. Wilson v. Magee, 359 So.2d 315 (La.App. 4 Cir.1978), aff'd in part, amended in part by, 367 So.2d 314 (La.1979). Dr. Wolfson's figures and opinion are unsupported by the evidence. McGowan did not produce W-2's, income tax returns or other evidence of earning capacity other than the testimony of family members which amounted to nothing more than claiming he earned unspecified meager sums for his handyman work. Lexington Insurance Company does not dispute Terry Kennedy's testimony about McGowan's lack of employment prospects; however, Kennedy's testimony provided no basis to support a claim for loss of income, either past or future.
Additionally, the jury may well have rejected the claim of $94,320.00 for a specially equipped van. The jury viewed a video recording of a day in McGowan's life. The video showed McGowan transferring himself unassisted back and forth from bed to wheelchair, and wheelchair to a car and feeding himself, although he was unable to prepare or cut his food. The jury in all likelihood disregarded Ms. Porter's testimony supporting the need for a van as incredible if for no other reason than that she based her opinion of McGowan's needs and disability on her impression he was quadreplegic rather than quadreparetic.
Another claim the jury could reasonably have rejected as unproven was $320,721.00 for maintenance therapy since Dr. Nour testified the family was capable of providing this care.
Subtracting the foregoing exclusions from the special damages demanded results in a total less than the actual amount awarded by the jury. Nevertheless, the jury may have decided to award limited amounts for loss of income and for occasional assistance to the family in caring for McGowan. Therefore, no matter how the jury arrived at the amount it awarded, its decision is supported by the evidence, and well within its discretion. C.C. art. 2324.1.
McGowan's final assignment charges error in the Trial Court's declaratory judgment which held Lexington was not liable for interest on the Board's $500,000 retained limit of liability.
Although the Sewerage and Water Board settled McGowan's claim against it for $500,000, its retained self-insured limit, McGowan contends among other things that Lexington is liable for post-judgment interest on the $500,000 by virtue of the "supplemental payments" clause in Lexington's policy with the Board. Because that policy does not expressly exclude liability for interest on the Board's self-insured limits, McGowan argues that the Lexington policy indicates an assumption of that obligation by virtue of its status as an excess insurer.
The pertinent policy provision reads in part: "Defense, Settlement, Supplementary Payments"
Solely as respects occurrences covered under this policy except for the amount stated in Item 3A2 of the Declarations, but not covered under the underlying insurance set forth in the Schedule of Underlying Policies, or under any other underlying insurance collectible by the Insured, the Company shall:
(b) pay ... all interest accruing after entry of judgment until the Company has paid, tendered or deposited in court that part of such judgment as does not exceed *478 the limit of the Company's liability thereon.
McGowan cites Soprano v. State Farm Mutual Automobile Insurance Company, 165 So.2d 308 (La.1964); LeBlanc v. New Amsterdam Casualty Company, 202 La. 857, 13 So.2d 245 (1943) and Travelers Indemnity Company v. Reserve Insurance Company, 364 So.2d 1041 (La.App. 1st Cir. 1978) in support of this argument; however, these cases are distinguishable because they address different policy construction and because they concern different fact situations. The "supplemental payments" clause of the policy limits Lexington's obligation to post-judgment interest, and the policy unambiguously provides only excess/umbrella coverage. The Board is self-insured for liability for bodily injury to the retained limit of $500,000. Lexington was cast in judgment only for those damages in excess of $500,000.
McGowan's contention that policy silence obligates Lexington to pay interest on the Board's retained limit is erroneous. Without a specific written agreement to the contrary, a party is liable for legal interest only on that portion of a judgment for which the party is cast. O'Donnell v. Fidelity General Insurance Company, 344 So.2d 91 (La.App. 2 Cir.1977). Therefore, Lexington owes no interest on the board's self insured limits. For the foregoing reasons, the Trial Court judgment is affirmed. The costs of the appeal are assessed to Lexington.
AFFIRMED.
BARRY, Judge, concurs in part.
My concern is plaintiff's minimal 18% comparative negligence. However, in applying the manifestly erroneous-clearly wrong standard, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
The jury determined 18% as reasonable and I have no basis to find manifest error. See Rosell v. Esco, d/b/a Jolly Elevator Corp., et al., 549 So.2d 840 (La.1989).

RE-HEARING GRANTED
Lexington Insurance Company requests a re-hearing of this matter on the issues of causation, jury assessment of fault and interest on the Sewerage and Water Board's retained self-insurance limits.
We grant Lexington's request, limiting the re-hearing solely to the interest question.
In resolving the issue of judicial interest, this Court stated that McGowan sought to recover post-judgment interest on the Board's $500,000.00 self-insured limits when, in fact, he sought recovery of any and all interest, both pre and post-judgment.
Although we concluded that Lexington owed no interest on the self-insured limits, to the extent our original judgment did not clearly state our determination of the interest question, the judgment is amended to clarify that, for the reasons stated in the opinion, Lexington does not owe McGowan either pre or post-judgment interest on the Board's retained self-insurance limits.
The original judgment remains unchanged in all other respects.
NOTES
[1] LSA-R.S. 9:2800, which provides a statutory requirement of actual or constructive notice of the defect causing the damage before a public entity can be held liable for damages caused by the condition of things in its care or custody, was not yet in effect at the time of this accident or filing of suit in the present case.